No. 12,852.

O'LOUGHLIN *v.* THE PEOPLE.
(10 P. [2d] 543)

Decided February 8, 1932. Rehearing denied April 18, 1932.

Mr. John M. Keating, Mr. John W. Shireman, Mr. John T. Weisz, for plaintiff in error.

Mr. Clarence L. Ireland, Attorney General, Mr. Edward J. Plunkett, Assistant, for the people.

Mr. Horace N. Hawkins, Mr. Kenneth W. Robinson, Mr. Max D. Melville, amici curiae on petition for rehearing.

Mr. Justice Moore delivered the opinion of the court.

Pearl O'Loughlin was convicted in the Denver district court of murder in the first degree and sentenced to life imprisonment at hard labor in the state penitentiary, to review which this writ is prosecuted.

Her assignments of error will be grouped and considered as follows: (1) Sufficiency of the evidence; (2) the admissibility of the testimony of her husband, Leo

O'Loughlin; (3) the opening statement of the district attorney; (4) the admissibility of the testimony of Captain Clark; (5) refusal to permit defendant to make a statement not under oath.

The information charged that: "On the Fourteenth day of October, A. D. 1930, at the said City and County of Denver, State of Colorado, Pearl O'Loughlin, did unlawfully, feloniously, wilfully, deliberately and of her premeditated malice aforethought, kill and murder one Leona O'Loughlin."

The prosecution contended that the defendant planned to kill her step-daughter, Leona, aged 10, Leo, the child's father, and Dennis O'Loughlin, his father, and pursuant thereto placed crushed glass in food consumed by Leona and Leo and in a sugar bowl used by Dennis O'Loughlin; that between the hours of seven and ten-thirty on the night of October 14, 1930, defendant struck Leona on the head with an automobile tire iron and threw her body in Berkeley Lake where it was discovered on October 17th.

The record comprises three volumes, 2394 folios and numerous exhibits. The proof of guilt was based entirely upon circumstantial evidence.

Leo O'Loughlin married the defendant in January, 1929. He had a daughter, Leona, aged 10 and she a son, Douglas Millican, aged 8, by a former marriage. For some months prior to the homicide, they resided with their children and Leo's brother, Frank, at 2320 Tremont street. During this time Leo was employed by the City and County of Denver as a detective working a night shift. Their marital relations were marred by three separations and threatened divorce.

In August, 1930, the defendant, her husband and Leona visited the home of Dennis O'Loughlin, Leo's father, at Fort Collins. Defendant helped prepare dinner. After this visit Dennis found crushed glass in his sugar bowl. Thereafter nothing unusual happened in their home until the night of October 10th. Mrs. Marybelle Shannon, de-

fendant's sister, and one of her sons ate dinner with them. Upon returning from work, Leo was given a drink of Ovaltine prepared by defendant and "no sooner hit the bed than the room was whirling." Mrs. Shannon owned a cat and a dog. The cat died on the night of October 10th and the dog two days later. An examination of the viscera of these animals revealed the presence of "a very small quantity of glass." Mrs. Shannon stated that her sister had once before October 10th, given her scraps from the table to feed to her animals, but denied that on the night of October 10th, any scraps were taken by her or fed to the animals.

Defendant prepared all meals served in her home. The evening meal of October 14th consisted of lamb chops, potatoes and rice. Leo testified "when we sat down it [the dish containing rice] was in front of Pearl. She set it over between Leona and I. I remember after she helped Douglas with lamb chops and potatoes he asked for rice; she told him no, he couldn't have any; that is, she turned him down, wouldn't let him have any." Leo had two helpings of rice and Leona one tablespoonful "after Pearl asked her to"; that night Leo returned to work at six-fifty accompanied by Detective Jones. Leona was last seen alive by Leo at that time.

Frank O'Loughlin testified that on the night of the 14th, he came home "between quarter of seven and half past seven, I went right straight to my room." "It was about quarter after eight, or maybe a little after that, that I had got in bed." "I heard Leona and Douglas at the bathroom door; my door was closed; I didn't see them, but I heard them; after that I never heard Douglas, or never heard Leona, or I never heard anybody. A little after that, I heard the door close downstairs." "I recollect that Leona had a cold, and I used to hear her hack sometimes at night, when she was coughing." "It seems, right up to that night, I had heard her cough." "I did not hear any coughing that night."

At about ten-thirty that evening, defendant appeared

at the home of Mrs. Ethel Sparr, an intimate friend who lived at 2476 West Argyle place, North Denver. She wore a housedress and shoes but no stockings. Mrs. Sparr testified: "When she first got there, did you have any conversation about the time?" "No, we didn't; but about the time she was—when I asked her where she had been, she said, 'have been here since eight o'clock.' I said, 'But you haven't been here since eight o'clock.' I said, 'All right.' She said, 'I have taken June to a doctor. This is the fourth time that I have taken her.'"

June Sorensen testified that she had been a friend of the defendant for about two years; that she had neither seen nor accompanied defendant to a doctor's office on the night of October 14th.

Leo stated that on the night of October 14th, "Pearl met me at the Hall about a quarter of twelve. She was in my car. She had on shoes and stockings. We arrived home at midnight or a little before. Frank was home and in bed. Pearl entered Douglas' room but she didn't enter Leona's room." The next morning Leo went to work about seven o'clock and returned home at about ten-thirty a. m. very ill. Defendant then told him "about Leona being missing went off without her breakfast." Leo's condition grew worse and he was confined to his bed at home until Friday, October 17th, when he was removed to St. Joseph's Hospital, remaining there until the following Tuesday.

The body of deceased was discovered in Berkeley Lake, Denver, on October 17th. An autopsy performed thereon revealed two scalp wounds apparently caused by a blunt instrument and several scalp bruises and that death was caused by concussion and asphyxiation. The stomach contained food which had been in process of digestion two or three hours indicating that death had occurred within two or three hours after this food had been consumed. An examination of this food content disclosed the presence of "about a teaspoon and a half of crushed glass." An enema taken from Leo O'Loughlin "was

examined for glass and glass was found to be positive."
The contents of a cup of sugar taken from the home of
Dennis O'Loughlin disclosed that "the material was a
combination of sugar and glass." Spots on a tire iron
taken from the trunk on the rear of the O'Loughlin car
which had been driven by defendant on the night of the
homicide "proved to be blood. They were human blood."
There was sand in Leona's clothing when her body was
removed from Berkeley Lake. There were particles of
similar sand on the tire iron when it was found. Upon
examination of the kitchen at 2320 Tremont street, Wal-
ter Byron, a detective, testified that he had there found
small particles of glass "on the sink board and on the
floor immediately under the sink board."

The prosecution sought to prove certain statements
made by defendant during her incarceration in the city
jail. Objection was made thereto by defendant on the
ground that all such statements were involuntary and
made under duress, physical and mental. The jury was
excluded, a lengthy hearing was had and the court sus-
tained defendant's objection and excluded all such prof-
fered testimony and instructed the jury that the defend-
ant's objections had been sustained and that "it is not
proper to have that testimony before the jury, as to any
statements that she may have made, or that may be
claimed that she made, at the City Hall. The main rea-
son that the court excluded it is because she was kept up
unreasonable hours in the night to be quizzed."

The testimony of Albert Clark, captain of detectives,
admission of which is attacked by defendant, follows:
Clark had a conversation with defendant on November
5th in the county jail. Defendant stated to Clark: "She
could clear herself and that she would show Leo that she
could, and he asked her how and she said that that night
of the 14th, she had received a telephone call, and after
receiving this telephone call, she went down to the cor-
ner to the mail box, and got out from under a rock, a
telegram, by the mail box, and went back to the house,

got her purse, and went down to send this telegram, and when she got down she didn't have change enough to send it, or she didn't know anything about sending telegrams, and she went back to the house and got that bill, I believe is the way she put it—the bill, or a bill—and went back to the telegraph office and had sent this wire, and then when she went back to the telegraph office and sent this wire, she was out with a man, and she said to Leo, 'You don't believe I was out with a man, do you?' And Leo says, 'I do not.' 'Well,' she said, 'I was.' 'Well,' Leo said, 'name him.' She says, 'If I name him,' she says, 'you will go out and get him, and Mr. Wettengel and Clark will go out and get him and charge him with accessory to the crime.' And she said Mr. Keating asked her the same question, and she wouldn't tell Mr. Keating. Mr. Keating, she said, wouldn't go get him, and she said she was afraid that he would. Leo then asked her to name the man, if she had been out with a man. He said he didn't care, if that was the truth, that is just what he wanted to know, and that he would be glad to check it out, and her not to worry about it, if that was the true story. She says, 'I will not name him.' She says, 'He is the man that I heard from, that sent me money, in Montezuma, when I was up on that vacation, when you wouldn't send me the money.' Leo says, 'I thought you said Mrs. Sparr gave you the money.' and she said, 'That is what I told you.' He insisted several times for her to tell the man, and she said she wouldn't name the man, and then he asked her how long she was out with this man, or what she did with the car, and she said she drove it over—their car—and left it by Mrs. Sparr's, and then came back there, and she told Leo—she says, 'You know that there was nothing wrong, because you know my condition.' '' He further testified that no telegram was either received or sent by defendant the night of October 14th.

After the introduction of the foregoing testimony the people rested.

A motion for a directed verdict for the defendant was interposed and overruled. Counsel for defendant thereupon made an opening statement wherein he stated "we will account for all of Pearl O'Loughlin's time."

Thereupon Eleanor Roberts, June Sorenson, Alta Johnson and Ethel Sparr testified to circumstances tending to show that a friendly relationship existed between defendant and Leona, but there was no testimony proving or tending to prove the whereabouts of defendant between the time she left the O'Loughlin home and arrived at Mrs. Sparr's residence at ten-thirty on the night of October 14th.

An instructor in petrology, mineralogy and petrography of the Colorado School of Mines testified at length concerning various microscopic and other examinations made of exhibits introduced by the people for the purpose of determining whether crushed glass was shown. His testimony was highly technical, but unconvincing.

The defendant did not testify in her own behalf, but her counsel made a request, which was refused by the court, that she be permitted to make a statement to the jury not under oath and not subject to cross-examination. The court remarked, "I will allow you to reopen your case and put her on the stand if you want to," but counsel stated that "he did not want the defendant to testify."

█ 1. We believe the foregoing recital of facts demonstrates the sufficiency of the evidence to support the verdict.

█ The record is strangely silent as to the whereabouts of defendant from seven to ten-thirty on the night of the homicide. Her alibis were proven untrue and she refused to take the witness stand and to explain why such statements were made, and the many facts and circumstances in evidence which, circumstantially at least, proved that she had been the perpetrator of a most atrocious murder. Under these circumstances she should not

now be heard to complain that the jurors found her guilty.

In *Gould v. People,* decided November 30, 1931, 89 Colo. 596, 5 P. (2d) 580, the defendant was convicted of murder upon wholly circumstantial evidence. Having failed to testify, he complained of its sufficiency. We there held: "It may well be contended that this is not an unusually strong case, and that its damning facts might be explained away. The truth, however, readily apparent, we think, from our foregoing statement, is that there is evidence to support this verdict, and that those facts were not so explained. It may be that defendant could have done this, but having the opportunity and failing to avail himself of it, he cannot now complain that the jurors drew inferences warranted by the evidence."

In *Blanda v. People,* 67 Colo. 541, 545, 189 Pac. 249, which involved a conviction based entirely upon circumstantial evidence, this court stated: "In *Martinez v. The People,* 63 Colo. 347, 166 Pac. 242, where defendant was convicted of murder, Mr. Justice Bailey, speaking for the court, said: 'Circumstantial evidence may be, and frequently is, most convincing and satisfactory. * * * Defendant was given an opportunity to explain under oath the many incriminating facts and circumstances presented by the state.' So here, defendants were given an opportunity to explain any incriminating facts and circumstances in evidence on the trial. They did not have to explain. It was their privilege to keep off the witness stand and make no explanation, and the statute provides that a failure to testify shall not be taken or considered as any evidence of guilt or innocence, and they should be accorded every privilege and protection the statute affords. But when they failed to explain incriminating facts and circumstances in evidence on the trial that lay peculiarily within their knowledge, they took the chance of any reasonable inference of guilt which the jury might properly draw from the whole evidence." Here, reason-

able inferences from the whole evidence, unexplained by the defendant, unmistakably brand her guilty.

2. Defendant contends that the testimony of her husband was inadmissible, being in violation of the Session Laws of 1929, page 642, which provides:

"There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore a person shall not be examined as a witness in the following cases:

"First. A husband shall not be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor shall either during the marriage or afterward be, without the consent of the other, examined as to any communications made by one to the other during the marriage; but this exception does not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other."

This section has remained the law of this state since 1883 (Session Laws of 1883, p. 290). It was reenacted in 1911 (Session Laws of 1911, p. 679), being section 6563, C. L. of 1921. A construction of this statute has been before this court in *Dill v. People* (1894), 19 Colo. 469, 36 Pac. 229; *Schell v. People* (1918), 65 Colo. 116, 173 Pac. 1141 and *Wilkinson v. People*, 86 Colo. 406, 282 Pac. 257.

In the Dill case, it was held that a wife was a competent witness against her husband charged with the crime of perjury which was committed in making a false affidavit in a divorce action against her.

In the Schell case, bigamy was held to be a crime committed by one spouse against the other such as to permit the wife to be a competent witness against her husband.

Two legislatures have reenacted the law as it existed at the time of the Dill case, thereby placing their stamp of approval upon our construction of the statute therein indicated. The legislature of 1929 by its reenactment of

the identical statute approved of our construction thereof in the Schell case.

In the Wilkinson case, the defendant was convicted of raping the daughter of his wife by a former marriage. After reviewing the Dill and Schell cases, the court states at page 411: "The principles announced in the Dill and Schell cases, supra, are sound, and have remained the law in this state for many years. If bigamy, and, under certain circumstances, perjury, are such crimes committed by one spouse against the other, as to render the husband or wife competent to testify against the offending party, it follows logically and inevitably, that rape is also such a crime. The innocent spouse is not precluded by the statute from testifying against the accused spouse, who stands charged with this offense. The innocent spouse is a competent witness, with or without the consent of the accused spouse, and such evidence is not within the prohibition of the statute. This is particularly true in this case, where the crime was committed against the natural daughter of the wife, and therefore an outrage upon nature in its dearest and tenderest relations as well as a crime against humanity itself."

The reason for the exclusion of such testimony is expressly stated in the statute. The status of husband and wife is one of those "particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate." When a spouse is charged with a crime involving a violation of the marital status such as the heinous crime here disclosed, the reason for the rule and its protection are annihilated. If rape of a stepdaughter is an "outrage upon nature in its dearest and tenderest relations as well as a crime against humanity itself" and constitutes a crime "committed by one spouse against the other," it must necessarily and logically follow that the murder by one spouse of the other's child is also a crime committed by one spouse against the other It may well be said that in this determination we have departed from the rule announced in *Bassett v. United*

*States*, 137 U. S. 496, 11 Sup. Ct. 165, followed in many jurisdictions, holding that one spouse may testify against the other only in cases involving personal violence one against the other. After an examination of the many and conflicting decisions in other jurisdictions, we are satisfied that not only do reason and justice demand the broader interpretation of the statute above indicated, but also that our legislature intended that such construction should be followed.

3. Defendant contends that a remark made by the district attorney in his opening statement that "Mrs. O'Loughlin admitted she committed the act" is reversible error. The entire statement of the district attorney appears in the record. He prefaced his remarks by the following statement:

"At this stage in the proceeding it is usually customary to briefly outline the facts which the State will attempt to prove, and upon which they will rely in their effort to request a conviction at your hands. The Court will subsequently instruct you that these statements are not evidence and are not to be considered by you as such. The only purpose is that you may understand how the testimony of any particular witness relates to the case and thereby a little more readily follow the case a little more readily. What I say now is not evidence; and I am not attempting to give you exact minutes or hours, but merely a rough picture of the case as the State's evidence shows it." He then related in a narrative way the facts which he expected to prove and concluded his remarks with this statement: "We expect to show you, after questioning for a considerable length of time at City Hall, Mrs. O'Loughlin admitted she committed the act."

All statements made by defendant at city hall were excluded and the jury advised by the court its reason for such action. In submitting the case to the jury, the court gave the following instruction:

"These instructions contain the law that will govern you in this case, and in determining the facts you should

consider only the evidence given upon trial. Evidence offered at the trial and rejected by the court and evidence stricken from the record by order of the court should not be considered by you. The opening statements and the arguments of counsel and the remarks of the court and of counsel are not evidence.

"The arguments, statements and objections made by counsel to the court or to each other, and the rulings and orders made by the court, and the remarks made by the court during the trial and not directed to you, should not be considered by you in arriving at your verdict. The court did not by any words uttered during the trial, and the court does not by these instructions, give or intimate, or wish to be understood by you as giving or intimating, any opinion as to what has or has not been proven in this case, nor as to what are or are not the facts in the case."

In view of the crime charged, the murder of a defenseless young child and the shockingly ruthless method of its perpetration, the opening statement of the district attorney was mild indeed. He neither attempted to prejudice the jury or to excite its passion nor to detail any statements claimed to have been made by defendant while incarcerated in the city jail. The record fails to show that defendant's rights were in fact prejudiced by the statements of the district attorney. In the absence of a showing to the contrary, and none here appears, the jurors must be presumed to be honest, intelligent, dispassionate and fair-minded men; to have faithfully performed their duties as jurors and to have complied with the instructions of the court and determined their verdict solely upon the facts in evidence. Mere possibility of prejudice is insufficient to warrant a reversal. We have had occasion to consider similar questions in the following cases.

*Henwood v. People,* 57 Colo. 544, 569, 143 Pac. 373. There the district attorney was repeatedly cautioned by the court not to transgress his rights and duties. In disposing of this question, the court stated: "The trial

court at their request had several times admonished the District Attorney, and advised the jury to disregard statements to which objections had been made, so that it is evident the jury understood that statements which had no bearing on the case as made by the testimony were not to be regarded by them, and for these reasons we are satisfied the defendant was not prejudiced by the remarks under consideration.''

*Mitsunaga v. People,* 54 Colo. 102, 129 Pac. 241. Objection was made that the opening statement of the district attorney narrating details of a purported confession constituted prejudicial error. Therein on page 107, it appears: ''It probably would be the better practice, ordinarily, for the prosecution in opening, merely to refer to such matters, without going into details; because at the trial, the offered evidence might be excluded. In this case, however, no harm was done the defendant, because the statements were afterwards held competent, and admitted in evidence.'' In the instant case, the district attorney followed this suggested ''better practice.''

In *Voris v. People,* 75 Colo. 574, 227 Pac. 551, it was held: ''During his closing argument counsel for the people stated, 'the record shows that the defendant was convicted the second time for forgery.' It does not appear whether the idea intended to be conveyed by this statement was two convictions or two forgeries. The statement was objected to. The trial Judge, apparently assuming that it meant, or might mean, two forgeries, promptly advised the jury that there was no evidence of it and directed them to disregard it. They were likewise instructed to consider only 'evidence given upon the trial' and that 'the arguments of counsel are not evidence.' Under the circumstances we think there is no probability that defendant was prejudiced by the remark.''

In *Wilder v. People,* 86 Colo. 35, 278 Pac. 594, it was held at page 45: ''The district attorney, in objecting to evidence and in arguing that objection in the presence of

the jury, used some questionable expressions. Under the particular circumstances here disclosed we think they were of little moment. Thereupon the jury was excused while objections were argued. On its return it was told by the court that counsel's statements should be disregarded. True, the statements were not quoted, nor the district attorney rebuked, nor mentioned by name; but since the court referred to 'remarks made by counsel' 'just before recess' we think the designations sufficiently specific and the error, if any, thereby cured.''

In *Ewing v. People,* 87 Colo. 6, 284 Pac. 341, the misconduct of the district attorney in his opening statement and closing argument was assigned as error. In disposing of this contention, the court said at page 9: ''The district attorney in his closing argument made several denunciatory statements concerning one who would perpetrate the crime of rape. Even if the district attorney was too vitriolic, such conduct did not constitute prejudicial error in view of the instruction given by the court that it is the duty of the jury 'to consider carefully all the evidence in this case and be governed solely by it in arriving at your verdict,' and further that 'the opening statements and arguments of counsel are not evidence, but are made to aid you in comprehending the evidence and the application of the law thereto.''

In *Weiss v. People,* 87 Colo. 44, 285 Pac. 162, complaint was made that the defendant was prejudiced in the eyes of the jury by a question asked on cross-examination by the district attorney. It was there stated at page 51: ''We find no error here of which the defendant can complain. Furthermore, at the conclusion of the evidence in the case, the court instructed the jury that they were to consider only evidence given upon the trial, and that evidence offered upon the trial, and rejected by the court, should not be considered by them in arriving at a verdict.''

In *King v. People,* 87 Colo. 11, 285 Pac. 157, claim was made that the court's treatment of defendant's counsel

constituted reversible error. In this case, the court gave the identical instruction given in the instant case. It was there held at page 21: "In view of this record, the remarks of the court to Mr. Mowry did not constitute prejudicial, reversible error. In any event, the instruction hereinabove quoted cured the error, assuming that one was made."

In view of these decisions and the record failing to disclose the defendant's rights were prejudiced by the remark of the district attorney, this assignment of error is unavailing.

4. It is claimed that the testimony of Captain Clark concerning statements of defendant to him was inadmissible. Counsel contends that where duress is shown it is presumed to continue until the contrary appears. Assuming this to be a correct statement of the law, the record discloses that this presumption was overthrown. The court, after hearing evidence as to the voluntary character of such statement, ruled the evidence admissible, holding in effect, that it was made voluntarily and without duress or threats. This ruling is supported by the evidence. It is to be noted that this statement was made on November 5th, about three weeks after the homicide, in the county jail and not the city jail, and after her counsel had cautioned her not to talk. Further, the statement is in no sense a confession of guilt, but is in the nature of an alibi. A similar situation occurred in *Mora v. People,* 19 Colo. 255, 260, 35 Pac. 179, wherein it is stated: "At the trial in the district court the accused did not go upon the witness stand, but the State, as part of its case against him, was allowed to introduce, over the objections of defendant, these various statements theretofore made by him, and afterwards introduced evidence tending to prove their falsity. The objection urged to the admissibility of these statements is that they were confessions induced by some hope or promise of a benefit, and therefore not voluntary. While we think the preponderance of the evidence tends to show

that these statements were freely and voluntarily made, yet their admissibility in evidence does not depend upon such fact. An examination of these statements discloses that instead of being a confession of guilt of the crime charged, on the part of Mora, they are explanations of the incriminating circumstances brought against him, evidently intended to show his innocence of any crime."

In *Byram v. People,* 49 Colo. 533, 535, 113 Pac. 528, it was held: "Error is also claimed in the admission of the alleged confessions by the defendants. An examination of the record fails to disclose that either of them made a confession. The evidence complained of was that of the officers of the city of Denver in testifying to statements made to them by the defendants that they were at a certain 'other' place when the crime was committed. This is in no sense a confession."

In *Potyralski v. People,* 53 Colo. 331, 332, 124 Pac. 742, the court stated: "There was no confession of guilt in these admissions. On the contrary, they contain a statement of defensive matter, in which the killing of the particular animal was admitted, but any purpose to steal it was denied, * * *."

In *People v. Weston,* 169 Cal. 393, 397, 146 Pac. 871, certain statements of defendant were objected to because involuntary. Therein the court stated: "Such statements do not constitute confessions, and the law does not require a showing that they were freely and voluntarily made, without improper inducement, in order to entitle them to be admitted in evidence."

In these circumstances the admission of the testimony of Captain Clark did not constitute reversible error.

5. The defendant claims that the court erred in refusing to permit her to make a statement not under oath and not subject to cross-examination. Apparently the common law rule permitted the accused in capital cases to make an unsworn statement to the jury at the close of the case, the reason therefor being that the accused was not a competent witness in his own behalf.

In Colorado, this rule was abrogated by the enactment of section 7101, C. L. '21, which provides: "Hereafter in all criminal cases tried in any court of this state, the accused, if he so desire, shall be sworn as a witness in the case, and the jury shall give his testimony such weight as they think it deserves; but in no case shall a neglect or refusal of the accused to testify be taken or considered any evidence of his guilt or innocence."

The reasons for denying the claimed right of a defendant to make an unsworn statement appearing in the case of *Reg. v. Millhouse*, 15 Cox's Criminal Law Cases 622, 623, appear to us to be sound and unanswerable: "I cannot permit the prisoner to make a statement of fact to the jury, he having elected to call witnesses. To allow such a course would be to give him a most unfair advantage, especially if he were an intelligent man. If it were to be allowed, the result would be that, after counsel had made a defense and called witnesses to facts, that then the prisoner, who was not liable to be cross-examined, could supplement what had been said by his counsel and witnesses, and supply facts by means of a statement made without the sanction of an oath, which it would be impossible to test by the ordinary means of cross-examination. As the law at present stands, a prisoner not being competent to give evidence upon oath, I am of opinion that it would be most impolitic and dangerous to allow the privilege urged by Mr. Horace Browne. In my judgment, to permit such a course of procedure would be extending most unfairly the rule laid down by the majority of the judges." We conclude that the court did not err in this respect.

Other assignments of error are without merit. A diligent examination of the entire record in this case convinces us that defendant had a fair and impartial trial. She was represented by able counsel who eagerly and zealously protected her rights throughout every stage of the proceeding. The trial court acted with commendable

fairness and its instructions adequately covered the law. Accordingly the judgment is affirmed.

MR. CHIEF JUSTICE ADAMS and MR. JUSTICE CAMPBELL concur.

MR. JUSTICE BUTLER specially concurs.

MR. JUSTICE BURKE, MR. JUSTICE ALTER and MR. JUSTICE HILLIARD dissent.

MR. JUSTICE BUTLER concurring.

I concur in the decision and in the opinion of the court. Two matters, however, seem to deserve further consideration; the opening statement of the district attorney, and the admission of the husband's testimony.   ·

1.   The district attorney's statement.

To justify a reversal on the sole ground of an improper and reprehensible statement by counsel, it must be clear to the court that the offense was so flagrant and its probable results so harmful that an instruction by the court to disregard it would be unavailing. That does not seem to be the case here. The oath taken by jurors in criminal trials binds them to render a true verdict "according to the law and the evidence." The district attorney took pains to explain to the jury that the purpose of the opening statement was to outline the facts that the state would "attempt" to prove. He told them that the court would instruct them that his statements were not evidence and were not to be considered by the jury as evidence. He expressly cautioned the jury that what he was about to say in his opening statement was not evidence. The court instructed the jury as the district attorney predicted. The court held that the offered evidence of the defendant's statement was inadmissible. In announcing the ruling, the court took pains to avoid characterizing the rejected statement as a confession, but guardedly referred to it as "*alleged* admissions, or confessions, or something of that sort." When the court an-

nounced its ruling, counsel for the defendant made this request: "We want the jury instructed, if your Honor please, as to why the evidence [*not* the confession, but the evidence] is not going to come before them." In response to such request, the court told the jury that the main reason for excluding the evidence was because the defendant "was kept up unreasonable hours in the night to be quizzed." It is evident that counsel made the request because he believed that the statement of the reason would be of benefit to his client; and it is not unreasonable to suppose that it had the effect of arousing sympathy for the defendant, for such naturally would be the effect produced. In view of the guarded language used by the court, it is unreasonable to believe that from what was said by the court the jury drew the inference that the defendant had confessed that she committed the crime, and that her confession had been withheld from them through a technicality invoked by her to escape the just penalty of the law.

The district attorney's opening statement is not sufficient cause for a reversal of the judgment.

2. The admission of the husband's testimony.

The common law permitted an exception to the exclusionary rule only in cases involving violence to the person of the spouse testifying. There being no statute in West Virginia changing that common-law rule, it was applied in *State v. Woodrow,* 58 W. Va. 527, 52 S. E. 545, cited in my brother Hilliard's opinion. The court held in that case that chapter 152 of the West Virginia Code of 1899 did not apply. In Georgia the statute permits the wife to testify against her husband, only upon his trial for a criminal offense "committed, or attempted to have been committed, *upon her person*"; hence the decision in *Grier v. State,* 158 Ga. 321, 123 S. E. 210, cited in my brother Hilliard's opinion. Even under a statute such as ours, the Supreme Court of Washington held, in *State v. Kniffen,* 44 Wash. 485, 87 Pac. 837, that a wife cannot testify against her

husband on trial for bigamy. We held to the contrary in *Schell v. People,* 65 Colo. 116, 173 Pac. 1141. In the Kniffen case, supra, the court cited *Bassett v. United States,* 137 U. S. 496, 11 Sup. Ct. 165, to the proposition that such a statute is but an affirmation of the common-law rule. But in *Dill v. People,* 19 Colo. 469, 36 Pac. 229, we declined to adopt that construction. We commented thus upon the decision in the Bassett case: "In that case the court had under consideration a conviction for polygamy under the laws of Utah. The civil code of that territory was the same as our statute in respect to the examination of husbands and wives as witnesses against each other, except that our statute applies to both civil and criminal proceedings, but the criminal code of Utah was as follows: 'Except with the consent of both, or in cases of criminal violence upon one by the other, neither husband nor wife are competent witnesses for or against each other in a criminal action or proceeding to which one or both are parties.' On review by the United States supreme court it was held that the wife was not a competent witness. The decision was fully warranted by the criminal code of Utah, and so the opinion of Mr. Justice Brewer declares; but he expressed the further view that the wife was an incompetent witness even under the terms of the civil code."

Our statute provides that the exclusionary rule does "not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other." All crimes are crimes against the public. A crime that directly affects an individual is also a crime against such individual. In *Dill v. People, supra,* discussing our statute, as applied to criminal cases, we said: "Our statute does not limit the right of the husband or wife to testify to criminal prosecutions for crimes involving personal violence, either actual or constructive; the language is unqualified that the husband or wife may testify against the other 'in a criminal action or proceeding for a crime

committed by one against the other.' This language is broad enough to include any crime, whether of violence to the person, or other crime committed by the husband or wife directly affecting the other. Since some private wrong or injury is included in every crime, it is evident that the word *crime* in that clause of the statute which permits the husband or wife to testify against the other in a 'criminal action or proceeding for a *crime* committed by one against the other,' means the private wrong or injury included in such public crime. The word must have such meaning, or the statute is meaningless. It follows that a wife is competent to testify against her husband in a criminal action or proceeding whenever she is the individual particularly and directly injured or affected by the crime for which he is being prosecuted."

The inclusion in the statute of the words relating to a civil action is significant. To admit the testimony of one of the spouses, perhaps it is not always necessary that a right of action for damages should arise from the commission of the crime; but where one spouse commits a crime for which the other spouse is entitled to recover damages in a civil action, there can be no doubt that that crime is "committed by one spouse against the other," within the meaning of the statute. That is true of larceny, embezzlement, seduction or rape of a minor female child of one of the spouses, a criminal act or criminal negligence causing injury to or the death of a minor child of one of the spouses, and is true also of certain other crimes.

The defendant was charged with having murdered her husband's child—with having caused by her criminal act the death of the child. It was a crime committed against the husband, within the meaning of the statute. He was a competent witness at the trial; not, however, because the crime was an outrage upon nature in its dearest and tenderest relations, or a crime against humanity itself, but for the substantial reasons stated above, for upon

substantial reasons only do courts ordinarily base their decisions.

For the reasons stated in the opinion of the court and in this opinion, I concur in the affirmance of the judgment.

Mr. Justice Burke dissenting.

Convinced, as I am, that a question is here involved more vital to this state than the final outcome of a single case, and more momentous to its citizens than the guilt of an individual, I feel constrained to dissent and state my reasons therefor. In examining that question two fundamental facts must be borne in mind:

First, that all evidence of defendant's guilt is circumstantial. Given all material facts, with their relationship correctly deduced, this is not only the strongest evidence known, it is infallible. Its inherent weakness, in many cases, is its incompleteness and the difficulty of its applicability. "Circumstantial evidence" might be said to be a witness who knows everything and who can not lie, but who speaks only when interrogated and then in an alien tongue. If every essential question has been asked, and every answer clearly comprehended, the verdict must be truth itself. But so difficult sometimes is the task of interpretation that jurors distracted by irrelevant issues must be almost superhuman to escape error.

Second, no one can read this record and say he is satisfied with it. This is a murder without a motive. The imagination which can supply one for defendant can, with equal facility, supply one for other actors in the drama. Counsel for Mrs. O'Loughlin said he would account for her whereabouts during all the time when the crime must have been committed. He failed to do this, since his client did not take the stand, and fancy finds the reason in guilt. But fancy can find other reasons equally potent to close the mouth of the accused.

I do not predicate what I have to say here upon any presumption that there is not, in this record, evidence to

support the verdict. I say only that a trifling error might have tipped the scales, hence we must be sure that the forms of law were followed, and that, in looking at the facts, the jurors were permitted to do so with open minds and eyes undimmed by the dust of prejudice. Were they? At the very threshold of the trial they heard from the lips of one whom they had every right to credit with knowledge of the law, acquaintance with the facts, and an integrity which made falsehood impossible—their own official, the public prosecutor—that all doubt of the identity of the murderer had been settled by defendant's confession. His statement was not merely an expression of hope, it was the affirmance of an accomplished fact. There was about it no pretense, no uncertainty, no lingering doubt. It was positive and unequivocal. When he started to detail certain purported admissions of defendant an objection was made and overruled. He thereafter closed his opening statement thus: ''We expect to show you, after questioning for a considerable length of time at the City Hall, Mrs. O'Loughlin admitted she committed the act. If we show these facts as outlined, gentlemen, we expect a conviction at your hands.

''Mr. Keating [For the defense]: With the Court's permission I will reserve my statement until the close of the prosecution's case.''

So the first witness was called and the jurors, with that undisputed assertion of defendant's admission of guilt ringing in their ears and furnishing the key for the interpretation of doubtful and inarticulate facts, entered upon their duties, and nothing thereafter happened during the entire course of the trial to remove the conviction which that statement must have carried. The state produced no such evidence. That failure alone might have led to the conclusion that no confession had been made, but it was not permitted to stand alone. The entire matter was gone into in the absence of the jury and the court correctly held that whatever was extorted from the defendant, during five days of her incarceration incom-

municado, was secured under duress, hence involuntary and inadmissible. Thereafter, *with the jury present,* the following occurred:

"Mr. Wettengel [District Attorney]: If the Court please, I believe that the State would be entitled to have the jury instructed as to the reason for the delay, and your Honor's rulings and statements, in the presence of the jury, concerning certain things being detailed. I except to your Honor's ruling on the point which has just been decided; but I think the jury are entitled to know that your Honor has made a ruling to that effect, that the statements are excluded. I do not know as you need to assign a reason.

"Mr. Keating [For the defense]: We want the jury instructed, if your Honor please, as to why this evidence is not going to come in before them.

"The Court: I am not so sure about that. I am not sure that they have anything to do with what is excluded, even though you both agree on it." * * *

"The Court: Well, at the request of both of you, I will go this far:—

"Mr. Keating: If the Court please, Mr. Wettengel, I believe, is admitting that he cannot prove what he said in his opening statement,—

"The Court: Let us not take that up now. Gentlemen of the jury, there was a question that was to be presented to you, as to the alleged admissions or confessions, or something of that sort, that may or may not have been given by the defendant at the City Hall, to the police department. The defendant has objected to any statement of that kind, on the ground that any statements that were caused to be made, were made through a form of duress, * * *. For the past twenty-four hours, the Court has taken that testimony outside of your presence, and the Court has decided that that testimony should not be permitted to be given to the jury. * * * The main reason that the Court excluded it is because she was kept up unreasonable hours in the night to

be quizzed. For that reason, you gentlemen will not have that part of the testimony which was in dispute.''

Thereupon the taking of testimony before the jury was resumed, and among the instructions finally given was No. 15, which reads in part: ''In determining the facts you should consider only the evidence given upon trial. Evidence offered at the trial and rejected by the Court * * * should not be considered by you. The opening statements and arguments of counsel * * * are not evidence. The arguments, statements and objections made by counsel to the Court or to each other, and the rulings and orders made by the Court, and the remarks made by the Court during the trial and not directed to you should not be considered by you in arriving at your verdict.''

Thus the jurors not only entered upon the trial with the definite information that this defendant had confessed, but they were told that it took the court twenty-four hours to hear the evidence of that confession, and advised that this was finally withheld from them, at her request and over the protest of the district attorney who had asserted that he had it and would produce it, and that it was so withheld for ''the main reason'' that ''she was kept up unreasonable hours in the night to be quizzed.'' The natural reaction of ordinarily intelligent and honest jurors, under such circumstances, would be the conviction that the very gist of the people's case had been kept from them through a trivial technicality behind which a confessed murderess sought immunity. It is doubtful if the most conscientious and strenuous efforts on their part to follow literally the quoted portion of the court's Instruction No. 15 would enable them to free their minds of that conviction, or remove its imprint from their verdict. But whether all this constitutes error we are not even called upon to determine. A wide latitude must be, and is, allowed counsel for the people in outlining to a jury what he thinks he will be able to produce. He is not infrequently disappointed in his expectations, sometimes because witnesses fail him, and

sometimes because the court rules against him on a question of law concerning which he had good reason to believe he was in the right. The things that are required of him are a reasonable knowledge of the law, reasonable grounds for the view he takes of it, a reasonable preparation of his case, and a reasonable belief that he will be able to produce what he says he will produce. Questionable therefore as this record thus far is I pass to the vital inquiry: Had this defendant confessed, and had the district attorney reasonable grounds for believing that her confession was admissible?

1. In the hearing before the court the chief of police, Captain Clark, several other officers, one of the jail matrons, and defendant herself, were examined. Every detail of the prisoner's conduct, questioning and treatment during the period in dispute was gone into. Neither here nor elsewhere in this record is any evidence of a confession to be found, and it is repeatedly denied. The nearest approach to it is the testimony of Chief Reed that she wrote on a piece of paper and delivered to him this statement: ''Take your circumstantial evidence and let it go at that.''

Neither is there evidence of statements or conduct which can reasonably be construed into a confession of guilt, nor even an admission of guilty knowledge. I can not, however, assume that the alleged confession was but a figment of the imagination. I therefore conclude that the construction put by the district attorney upon all defendant's statements and conduct, as fitted by him into facts established, was that they were inconsistent with innocence, hence equivalent to admissions of guilt. On that assumption the question arises: Was there reasonable ground for believing evidence of such statements and conduct admissible? That question can only be answered by an examination of the circumstances under which the so-called admissions or confessions were made and the means of their procurement.

It was charged that the murder was committed October

14. The information was filed October 24, and defendant arraigned the following day. On October 17th she was taken by the officers from her home to the City Hall, interrogated at length, and returned in a police car and with a police escort. October 19, Sunday, she was first technically placed under arrest, and incarcerated. She was in the hands of the police and the district attorney until the late afternoon of Thursday, October 23, when her counsel, under a court order, first succeeded in reaching and advising her. The occurrences, in question now, transpired while she was in company of the officers on the 17th, and from the time she was again taken into custody on the 19th until counsel reached her on the 23rd. Her own story of her treatment is so shocking as to be unbelievable but for the fact that its outlines are admitted and it bears much internal evidence of truth. But, considering its source, and the further fact that, if true, some of the worst of it might have been unknown to the prosecutor, I merely sketch the story as revealed by the people's witnesses.

Defendant was taken to the station about 3 p. m. on the 17th, questioned for approximately three hours, and returned to her home. She was brought back under arrest on Sunday the 19th about 2 p. m. and examined for two hours, and returned to her cell. She was called back for further examination at 11 that night and the investigation continued until 2 the next morning. On Monday the 20th her counsel made a futile attempt to reach her but was denied an interview, and she was again questioned from 8 p. m. until 11 p. m. On the 21st her counsel again endeavored to see her and was refused permission, for the reason, as given by the officers on the stand, that he would advise her not to talk and they did not wish her to know she could refuse. About 2 p. m. this day she was taken to the General Hospital and, by surprise, to a mortuary where the body of the murdered girl lay. She was accompanied by a police captain, two detectives and the district attorney. The body and the

girl's clothing were dramatically exhibited to her.  She was told this was the last time she would see the girl and such demands as the following were made: "Why did you put this little girl in the lake"; "If you have a soul and a conscience tell us who you are shielding." After strenuous denials of guilt, or guilty knowledge, she asked to be permitted to kneel beside the coffin and pray. This she did.  She was returned to jail about 5 p. m. and again examined from 8:40 p. m. to 11:30 p. m.  On the afternoon of the 22nd her counsel applied for a court order permitting him to see her.  That application was taken under advisement.  At 9 p. m. on the same day she was brought back to the Captain's office and kept waiting outside until 10.  Beginning at that hour she was grilled until 4:20 in the morning.  In the beginning the Captain said to her, "One of us is going to break and it's going to be you."  At another time he said, "You know I'd hate to crack your neck if you are innocent but circumstances are against you.  Tell me, did you do it alone?" At the close of the session defendant was helped out of the office.  On the following day her counsel's application to see her was argued and again taken under advisement.  Thereupon an application was made to this court for similar relief, but about 3 p. m., and before action here, the order of the district judge was issued, and armed with it counsel reached his client, interrupting another inquisition which was then in session.  In resisting the issuance of the order on the 23rd the prosecutor gave the court as one of the reasons for his opposition that if counsel was permitted to see his client he would advise her not to talk.  On the issuance of the order her counsel was promised that on that night she would be permitted to rest.  Nevertheless she was again called at 9 p. m. and examined until 2 a. m.  During this time she declined to talk about herself "on advice of counsel."

During these several examinations there was repeated talk of "cracking her neck."  We find such questions as these admitted: "Frank helped you didn't he?"  "Why

hold out if Frank helped you do it?'' Defendant's condition is partially disclosed by the Chief's admission that at one time ''she was hysterical, extremely hysterical,'' and by such of her admitted answers as the following— ''When are you going to let me sleep?'' ''Get Frank, test his sanity, test mine, he is crazy, I am crazy, my God we must both be crazy,'' and ''Take me out and hang me.'' If there be a lingering doubt of the purpose of this inquisition, or the probable persistency of it, these are settled by the statement of one of the officers that its purpose was to get a confession and that if a court order had not stopped them they would (at the time of the trial) be grilling her yet.

The full force of the foregoing will yet be missed unless it be further borne in mind that when defendant was brought to the jail on Sunday the 19th her condition of health was such that absolute cleanliness was indispensable to decency, and the withholding of certain mechanical appliances requested, a positive menace. Notwithstanding which the latter were unreasonably delayed and she was permitted nothing resembling a bath until 2 a. m. on Wednesday. For the first two days she ate practically nothing, her quarters were vermin infested, there was a toilet within a few feet of her, the rooms in which she was forced to sit were at times smoke filled, and for a portion of the time a violent and noisy insane woman was confined next to her. During some of the sessions her interrogators worked in relays, and during most of them the district attorney was present a part of the time and participating.

I submit that no admission or confession, wrung from an accused person under similar circumstances, have ever been permitted to go to a jury in any English speaking country within the memory of any man now living, and no public prosecutor could have the slightest reason to believe that such evidence was admissible. Hence when the district attorney said in his opening statement that he would produce it, he made a promise without justifi-

cation and led the jury to believe that a confession existed which did not exist, and thus prejudiced their minds and influenced the whole course of their deliberations with the conviction that a trivial technicality had kept from them the vital and undisputed fact.

At the time of these occurrences defendant was merely held for safekeeping. No information had been filed against her. She was denied the first and most indispensable right of every person so incarcerated, the benefit of counsel. Her treatment was that of one whose guilt was beyond question and whose conviction only awaited an admission to be extorted by any conceivable means short of actual physical violence. And yet, even after charge and arraignment, and upon final trial, the jurors were to be solemnly told that she was presumed to be innocent until proven guilty beyond a reasonable doubt, were required to take an oath to so hold her, and expected in all seriousness to abide by that oath.

If the opening statement of the district attorney be given the approval accorded it in the court's opinion, if the attempted extortion of a confession of guilt from this defendant be thus sanctioned, if the denial to her of benefit of counsel by those sworn to enforce the law be thus condoned, other and even more gross instances of the violation of fundamental rights may be expected, which drastic legislation alone can obviate. We should not forget that if the guilty may be so treated with impunity the last shield of the innocent is shattered.

Not an authority cited in the main opinion touches the point I make. The statements in the Henwood, Wilder, Weiss and King cases dealt with matters occurring during the taking of testimony, or during final argument, ordinary blunders occurring in the heat of trial, and the evidence referred to in counsel's opening statement in the Mitsunaga case was actually and properly admitted. Neither in these, nor in any case called to the court's attention, or known to me, has a bald assertion of confession of guilt, or the existence of positive evidence of

guilt, made in an opening statement, which assertions were untrue or which evidence counsel had no reason to believe existed, or if existing to believe admissible, ever been approved by a court of last resort.

"Counsel has no right in his opening statement, to rehearse before the jury facts which he is not in a condition to prove. It is the duty of the judge to see that this rule is not overstepped, and therefore he has a right to ask the counsel if he means to prove what he has stated." Thompson on Trials vol. 1, §263. "It is equally the duty of the trial court to restrain every effort on the part of counsel, in their statements to the jury, to introduce matters which are foreign to the issues, and especially matters which have a tendency to excite the prejudice of the jury." Id. §264. "Where counsel have overstepped the bounds of the preceding rule, it is the plain duty of the judge, * * * to reprove the practice in the hearing of the jury, and afterwards, in *instructing* the jury, to admonish them to dismiss from their minds the statements thus made; though where the privilege of advocacy in opening the case has been greatly abused in this regard, such an instruction may not be sufficient to cure the irregularity, but it will be ground of new trial." Id. §265.

The principle involved is the identical principle governing the offer of evidence known to be inadmissible, i. e., the creation of a prejudice which in all probability cannot be removed. The proposition is well stated and applied, and a violation of the principle held reversible, in a very early decision by the Supreme Court of Michigan. *Scripps v. Reilly,* 38 Mich. 10, 14, 15.

Recitals of counsel, in his opening statement, of inadmissible and prejudicial facts was held by the Supreme Court of Illinois to justify reversal. *Hennies v. Vogel,* 87 Ill. 242, 244.

In the foregoing instances the rule was announced and acted upon in civil cases. It should be more strictly applied in criminal trials where the risk of prejudice is or-

dinarily much greater. The Supreme Court of Michigan so applied it when the charge was receiving stolen goods and the prosecuting attorney, in his opening statement, asserted that defendant had committed perjury in another matter. For that error the judgment was reversed in an opinion in which Mr. Justice Campbell, speaking for the court, said: "In some cases, there is some apparent palliation in the excitement of a contested trial, although that does not obviate the mischief. But here the wrong was done in making the opening, and before any testimony was in, and when the prosecutor knew, or should have known, in advance what his case was to be, as he presented it. * * * The verdict must be set aside and a new trial granted." *People v. Moyer,* 77 Mich. 571, 43 N. W. 928.

It has taken too many centuries, too much blood, and too many hard won constitutions, to insure men and women fair and impartial trials and freedom from the threat of convictions obtained by confessions extorted by torture, to permit these rights to be now prejudiced by hasty action. In the Moyer case, supra, Justice Campbell stated the point clearly when he said: "Nothing can bring more contempt and suspicion on the administration of justice than the failure of its ministers to respect justice."

For the error herein discussed I think the judgment should be reversed.

I am authorized to say that Mr. Justice Alter and Mr. Justice Hilliard join in this dissent.

Mr. Justice Hilliard dissenting.

I am in accord with the views expressed by Mr. Justice Burke, and feel it proper to express my admiration of his masterly exposition of underlying principles of our Anglo-Saxon heritage of liberty within the law.

But I dissent for the further reason that in my opinion it was error to permit the husband of the accused to testify. In the circumstances of this prosecution he would

not have been a competent witness at common law and our statute likewise should be held to have precluded him. "The general rule at common law," we said in *Dill v. People,* 19 Colo. 469, 36 Pac. 229, "was that neither husband nor wife was a competent witness for or against the other. But the rule had this exception, that if either was prosecuted for a felonious crime or high misdemeanor involving violence to the person of the other, the party against whom the crime was committed was a competent witness in behalf of the state." See also §303 Underhill's Crim. Ev. (3d Ed.) ; 28 R. C. L. 482, §68.

Our statute (§6563, C. L. 1921) reads: "A husband shall not be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor shall either during the marriage or afterward be, without the consent of the other, examined as to any communication made by one to the other during the marriage; but this exception does not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other."

In this state, following the decisions of the courts of Iowa and Nebraska, we have construed the statute to the effect that in prosecutions for sexual crimes the injured spouse is a competent witness against the other. *Wilkinson v. People,* 86 Colo. 406, 282 Pac. 257, where the husband was charged with rape, and *Schell v. People,* 65 Colo. 116, 173 Pac. 1141, where the prosecution was for bigamy. The basis for the holding that the wife was a competent witness in the Schell case was that bigamy is a "crime against the wife within the meaning of the statute." The court adopted the rule laid down in *State v. Sloan,* 55 Ia. 217, 220, 7 N. W. 516, where it was said: "In our opinion, if the defendant is guilty of bigamy, he committed a crime against his wife. We think that she was a competent witness." In the Wilkinson case, grounded primarily on the holding in the Schell case, and fortified by decisions from Iowa and Nebraska, we held that rape

perpetrated by the husband upon his wife's daughter by a former marriage, constituted a crime against the wife, and therefore the wife could testify. In the opinion of the court in the case at bar much is made of the language in the Wilkinson case referring to the wife's daughter, etc., but the *crime against the wife* which made her a competent witness was not that he had outraged her daughter, but that he had had carnal intercourse with another woman. A reading of the Iowa and Nebraska cases makes that point clear, and it is to those courts alone we have resorted for precedents. The decisions of those states, and our own, are contrary to the weight of authority, for nearly all other courts, including the Supreme Court of the United States, have held otherwise. *State v. Kniffen,* 44 Wash. 485, 87 Pac. 837. In that case the court said: ''While much may be said in favor of the position that bigamy, adultery and kindred crimes are committed by one spouse against the other, yet the weight of authority seems to be opposed to that rule.'' But my purpose is not to discount our own decisions, and if similar facts were here presented I should consider them controlling. What I protest is the extension of the doctrine, for I conceive that the opinion of the court does violence both to the common law and the statute. Iowa has refused to extend it beyond what her courts term ''sexual crimes,'' as for example where the charge was that of forgery by the husband of the wife's name. *Molyneux v. Wilcockson,* 157 Iowa 39, 137 N. W. 1016. Indeed the restriction has been extended even to sex crimes, as in *State v. Wilcox,* 185 Iowa 90, 169 N. W. 646, where it was held that the wife was not a competent witness where the crime is that of attempted rape. After a discussion of the rule, the reasons for it, and its limitations, the court said: ''But suppose that, to now, it has never been held that the wife may not testify on a prosecution of the husband for assault with intent to rape. There must be a first time for right and reasonable decisions. For that matter, it may be said that no decision that the testimony

here is receivable has ever been made, unless holding that such testimony is proper on prosecutions for incest, adultery, or bigamy settles that it is proper on a charge of assault with intent to rape." It would be profitable for this court to keep in mind that until the announcement of the judgment here it has never been held in any jurisdiction under a statute similar to ours, or under the common law, that where the charge is murder the husband or wife of the alleged perpetrator is a competent witness. I quote further from the Wilcox case: "Of course, adultery by the husband is a crime against the wife. And of necessity, incest and bigamy include adultery. That fact alone is a sufficient reason why holding that adultery, bigamy, and incest are within the exception is no warrant for holding that an intent to commit which, if consummated, would involve adultery, brings the case within this exception. How can it, in reason, be said that a naked intent to ravish a third person is 'a crime committed against' the wife? The State concedes the exception applies to nothing but sexual crimes. How can it be maintained that an unaccomplished intent to rape is a 'sexual' crime? * * * If the words, 'prosecution for a crime committed against the other,' apply to a prosecution for -assault with intent to commit rape, it must be because the words of the exception should be read, 'a prosecution for an act which is in any way offensive or injurious to the other.' If that be the true interpretation, then, if the husband commit murder, the wife may testify against him. Surely, it must deeply shock, hurt, offend, and, in a sense, injure any good woman to find herself married to a murderer. It is sufficiently indicated in our own decisions that this is not the correct construction of the statute words, because, for one thing, we held in Molyneux v. Wilcockson, 157 Iowa 39, that the husband's forging the name of the wife did not bring the prosecution within the statute exception."

When it is reflected that, Iowa and Nebraska excepted, we stand alone in holding that sexual crimes constitute

an exception within the meaning of the statute, it occurs to me that the statement of the Iowa court (when the logical extreme was presented to it) that "there must be a first time for right and reasonable decisions," should make favorable appeal here. Otherwise, it would appear, we are committed to the eventual judicial repeal of a statute which is found in substance not only in the laws of the several states but is grounded on the common law itself.

In *State v. Woodrow,* 58 W. Va. 527, 52 S. E. 545, 2 L. R. A. (N. S.) 862, a husband and father was tried and convicted on an indictment charging murder of his child. The child, aged fourteen months, was in its mother's arms when the husband shot it, the bullet also wounding the mother. In reviewing the point the West Virginia court held that the crime was not against the wife in the sense of the common law rule and the West Virginia statute (Code W. Va. 1899, Ch. 152, §19), and ordered a new trial. The West Virginia court emphasizes that judicial proceedings should not be colored or swayed by emotion, that hard cases should not be permitted to make bad law. I quote: "The sole question in this case is, Does this case come within the exception to the rule; that is, was the prisoner's act of shooting the child a crime against the wife? It was not violence to her person. It was not a crime against her person corporeally. Such it has to be under this exception. It is true that there has been considerable difference of opinion as to what instances fall within this exception. Some cases hold that bodily violence to the wife is not the only case under the exception. For instance, cases of bigamy, and other cases, have been held to fall within the exception. The books must be resorted to for full discussion. It will be found that, though cases where no actual violence constituting assault and battery upon the wife have been held to fall within the reason of the exception, yet they are cases which directly affect the legal right of the wife, rights going along with her personality or person, as an indi-

vidual separated from all other persons. However, I can safely say that the great bulk of American decision is, that to come within the exception, the case must be one of personal violence to the spouse. *Bassett v. U. S.*, 137 U. S. 496, [34 L. ed. 762, 11 Sup. Ct. Rep. 165]; *Baxter v. State* [34 Tex. Crim. Rep. 516], 53 Am. St. R. 720, [31 S. W. 394]; *Crawford v. State*, 67 Id. 829 [98 Wis. 623, 67 Am. St. Rep. 829, 74 N. W. 537]; *Commonwealth v. Sapp*, 29 Id. 406 [90 Ky. 580, 29 Am. St. Rep. 406, 14 S. W. 834]. And I repeat that those cases, like bigamy and others that do not actually involve violence to the person, which are held within the exception, are cases where the wrong is to the *individual particularly and directly injured* by the crime for which the husband is prosecuted. *Dill v. People*, [19 Colo. 469], 41 Am. St. Rep. 254 [36 Pac. 229]. But the instances mentioned—I mean the cases—not requiring actual violence to persons, are confined to a few states. The weight of authority is otherwise, requiring personal violence or a restraint of liberty to the wife; restraint of liberty being a wrong to her person. *Bassett v. U. S.*, 137 U. S. 496. The act must touch her person, or her personal individual right, as a person distinct and individualized from the balance of the community, to come under the exception spoken of. An enormous wrong this murder was to the mother in a moral point of view, in an emotional point of view, in a sentimental point of view; in a pathetic point of view, under emotions of the heart which move human beings, owing to the relation of mother and child. We are apt to consider this terrible crime as a greater one against the mother than to any other living human being; still, in a physical point of view, the homicide did not touch the person of the wife, but was only a crime against her as one member of the community; I mean in the eye of the law. Remember that Woodrow was tried for killing the child, not for shooting his wife. On a trial for shooting his wife she could, under the exception stated, give evidence against her husband."

The Woodrow case was followed in *Grier v. State*, 158 Ga. 321, 123 S. E. 210. There the father shot at the mother but killed their son. The conviction was reversed because the wife was permitted to testify against her husband. I have found no case of homicide by one spouse, even though it be of one dear and near to the other spouse, holding that the spouse not accused may testify against the other. However shocking the crime it does not operate against the innocent spouse in the sense held in this, and two other jurisdictions to obtain in sexual crimes. In the nature of things the relationship of the deceased to one of the spouses has no bearing upon the offense of the spouse who commits murder. The relationship is but incidental, whereas, as we have held in relation to sexual offenses, the innocent spouse is injured in an especial and personal way.

I do not wish to be thought to have overlooked *Dill v. People, supra,* which may be believed to have extended the rule beyond sexual crimes and, therefore, to be in point here. In that case the court justified the wife's right to testify on the ground the charge of perjury grew out of his false affidavit for publication of summons in a divorce action against her. The case is capable of reconciliation with the Iowa and Nebraska cases and our Schell and Wilkinson cases, or, at least, is clearly distinguishable from a prosecution for homicide. While not a "sex" case it directly involved the matrimonial relationship which the husband had attempted by perjury to injure or destroy. His conduct affected the wife directly and in her own person; in a sense it fairly involved "a crime committed by one against the other."

We have seen that in other jurisdictions the wife was not allowed to testify against her husband in cases where *their* child was the victim of the homicidal act. The decisions were based on statutory provisions similar to ours and were in harmony with the common law. These decisions, I submit, are sufficiently persuasive to justify a reversal of the contrary holding below, in what to this court

is a case of first impression. Nevertheless the court has here announced the rule that if the slain child is not of the issue of both spouses, then the spouse who is the child's parent may testify where the other is charged with the homicide. It is my belief that such holding violates the cardinal purpose of the statute, makes nugatory that which the legislature has determined is in the interest of public policy, and allows evidence from a source denied at common law.

We have been zealously observant of the portion of our statute which disqualifies one spouse from testifying against the other in civil actions. *Bradbury v. Brooks,* 82 Colo. 133, 257 Pac. 359; *Jasper v. Bicknell,* 68 Colo. 308, 191 Pac. 115. I do not think we should be less so here. A better disposition of the point would be to adopt the modified Iowa doctrine, the decisions of whose court we have hitherto followed in respect of this statute, and in criminal prosecutions limit the exception to sex cases, as that court has now done. I regret that this cause was not availed of for such a decision in this jurisdiction.