## No. 12,426.

### KING *v.* THE PEOPLE.
(285 Pac. 157)

Decided January 20, 1930. Rehearing denied February 24, 1930.

Mr. Lewis deR. Mowry, Mr. Robert D. Charlton, for plaintiff in error.

Mr. Robert E. Winbourn, Attorney General, Mr. E. J. Plunkett, Assistant, for the people.

*En Banc.*

Mr. Justice Moore delivered the opinion of the court.

Farice King was tried in the district court of the City and County of Denver, found guilty of murder in the first degree and sentenced to the state penitentiary for life. She is here seeking a new trial.

The information charged that on November 28, 1928, the defendant, Farice King, did "unlawfully, feloniously, wilfully, deliberately, and of her premeditated malice aforethought, kill and murder one Robert K. Evans." The defendant entered a plea of "not guilty and not guilty by reason of insanity at the time of the commission of the alleged offense." Thereafter defendant filed a motion requesting that the court enter an order directing the district attorney to return to her, or to permit her to inspect, certain letters written by the deceased to the defendant which were taken from the defendant's possession at the direction of the district attorney after the commission of the offense charged in the information. The affidavit in support of this motion charged that the numerous letters and documents thus held by the district attorney should be returned to her in order to permit her to prepare her defense of insanity. The answer of the district attorney admits that he had in his possession many letters presumably written by the deceased to the

defendant, but that all bear date prior to the year 1922; that said letters are entirely too remote to have any effect upon her mental condition at the time of the homicide and are wholly irrelevant, immaterial and inadmissible. This motion was denied. Thereupon, pursuant to defendant's notice and request, the court ordered the taking of the depositions of Earl Wettengel, district attorney, and Harry Lane, a city detective, and the production in court, pursuant to a subpoena duces tecum issued at the request of defendant, said letters and two diaries belonging to the defendant. The district attorney filed a motion to quash the subpoena duces tecum, which in substance charges that the sole purpose of taking the deposition of the two witnesses, Wettengel and Lane, was to accomplish indirectly an inspection of said documents which the court had theretofore refused. The depositions of Wettengel and Lane were taken. These disclose that Lane had taken from the home of Mrs. Hanson, sister of defendant, where defendant resided, at 784 Garfield street, Denver, a bundle containing from 150 to 250 letters written by the deceased to the defendant, a few post cards and two small diaries. Defendant demanded that these documents be produced in court, identified, and made a part of these depositions. The court refused to permit this procedure and granted the motion to quash the subpoena duces tecum on the ground that the defendant sought by this method to circumvent the order of the court theretofore entered denying to defendant an inspection of said documents. Thereafter, the case was set for trial on February 25, 1929, and tried before a jury and Judge Charles C. Sackmann. On March 3, 1929, the jury returned its verdict in open court before Judge Frank McDonough, Sr., who received the same at the telephone request of Judge Charles C. Sackmann, who at the time the verdict was returned was confined to his bed, under the orders of his physician.

The evidence discloses that the defendant came to Colorado in 1908; was married in 1912; her husband later

deserted her; a child was born of this marriage, which later died, and thereafter the defendant completed, successfully, a course at the Denver General Hospital as a trained nurse, and thereafter up until the time of the homicide followed her profession rather regularly and held numerous responsible positions in that capacity. In 1917, defendant, being then of the age of 27 years, met Robert K. Evans, who was then a married man, which fact became known to the defendant during the ensuing year. In 1918 Mr. Evans went into the naval service of the United States and was stationed at San Diego for training. There was some talk between defendant and Evans with regard to his getting a divorce from his then wife and marrying the defendant. Just before going to San Diego defendant and Evans were intimate, she at that time knowing that he had a wife from whom he was not divorced. Later, in the latter part of 1918, defendant followed Evans to San Diego and there had brought to her attention numerous instances of his deception. Considerable correspondence was carried on between defendant and Evans up until some time in the year 1922. Evans later returned to Denver, and in 1923 defendant had information that he was going with someone else. Defendant claims that prior to this time Evans had promised that at some time he would marry her. However, in April, 1924, Evans married another woman, with whom he was living at the time of his decease. There was only an intermittent contact between defendant and Robert K. Evans from 1918 down to the time of the homicide in 1928, and practically all letter writing ceased between the two in 1922. In 1927 the defendant became engaged to a man in Texas, and was so engaged at the time of the homicide. In November, 1928, Robert K. Evans, being then on the police force, was shot in making an arrest, taken to the Denver General Hospital and placed under the care of a nurse there. By chance Miss King was also in the same hospital at that time engaged in the care of another patient in her capacity as a trained

nurse. She knew that Evans was married and living with his wife, Lillian, at that time, but sought out Evans in his room at the hospital and had considerable conversation with him and obtained permission to act as his nurse. She claims that there was considerable talk of love and affection between herself and Evans while he was so confined in the hospital; also that some improper suggestion was made to her by Evans as to being intimate with her in the hospital, which was rejected. In one place in her statement to Dr. Ebaugh, we find this language: "I tried to talk of love, and he did not seem to want to be affectionate. I asked him if he would not see me some time when he left. He said he did not know, would not talk much and would not encourage me." In spite of all these episodes having taken place and the facts that had come to the attention of the defendant, she claimed to still love the said Evans most intensely. Defendant had planned to be married to a man in Texas in December, 1928. After a day or two at the hospital, the defendant stated: "I tried to say something about the future, and he said, 'Don't bring up anything else.' I said, 'Life has been so empty and you will soon be going away.' He said, 'Well, you are a good nurse, Farice.' I said, 'I want something more than being a good nurse; I want you, and I want what you promised me and your love; I want you so much; you are always building up my hopes, and they are crushed.' He would not give me much satisfaction about the future plans, so I thought I would tell him that I was going to be married to Mr. Daniels in Texas. * * * I wanted to tell him mainly to see what effect it would have on him." The next day the defendant purchased the gun, with which the shooting was done, from Mr. Berger, a secondhand man at 1715 Larimer street, giving a false name and address, May Wilson, 1114 Acoma street. Several hours previous to the homicide, defendant conversed with deceased and said: "I told him I could not live without him and that I would have to bring an end to my life. * * * I tried

to kiss him and he pushed me away. It was 12 o'clock." This was just a few hours before the shooting occurred. Defendant at that time had the gun, which she purchased the day before, in her pocketbook. A few hours later shots were heard, and upon entering the ward, the attendants found Robert K. Evans lying in his bed, in a position which indicated that he had been asleep, with a bullet wound through his brain and another through his heart, either of which would have caused death. The defendant was found lying on a cot next to his with a self-inflicted bullet wound in her left breast.

Two notes written by the defendant were found in the room, one addressed to the deceased as follows:

"Dearest Bob. You belong to me, and I cannot go on any longer,—living without you. And you shall not go on. I have waited over 5 years for this chance, and it came.

"I hope no one else will ever know the real cause for this—

"only you and I
"Farice."

The other:

"11-28-28—2 A. M.

"Please bury me at the same time and near him.

"I'm sorry for the grief and sorrow this brings to all of you.

"Farice."

We shall consider the assignment of errors as presented in defendant's brief.

1. It is claimed that a new trial should be granted because the evidence raises a reasonable doubt as to defendant's sanity at the time of the alleged commission of the offense.

The record in this case is voluminous, consisting of 3 volumes, 725 pages and 1,904 folios. The proceedings at the trial cover 530 pages and 1,512 folios thereof. Outside of the testimony of witnesses disclosing the facts of the homicide, the entire time of the trial, five days, was

consumed by the taking of testimony of witnesses, lay and expert, as to the mental condition of the defendant prior to and at the time of the commission of the crime charged. In behalf of defendant, 30 witnesses testified. The defendant was called as a witness, but was not sworn and did not testify. Two alienists, Drs. Tepley and Pershing, testified for the defendant and stated that in their opinion, the defendant was suffering from a form of insanity known as melancholia and was insane at the time of the homicide. Their testimony covers 100 pages of the record. The alienists testifying for the state, Drs. Ebaugh, Johnson and Delehanty, each stated that in his opinion the defendant was not a melancholiac and was sane at the time of the commission of the homicide. Their testimony covers 91 pages of the record, so it appears that the testimony of experts consumed approximately 40 per cent of the time taken for the trial of the case. Defendant's sole defense was that she was insane at the time of the homicide. In support thereof, the court permitted numerous lay witnesses, relatives and friends of the defendant, to testify concerning defendant's statements and conduct throughout her life and with more particularity as to events occurring after defendant met the deceased; the introduction of all letters which were written to the defendant by the deceased, notwithstanding that no letter bore a later date than 1922, which were shown to have been read by the defendant to the witness so testifying, and the experts to testify at length concerning the character of their examinations, the statements made by the defendant to them, her conduct during such examinations and while under observation and their opinions of her sanity or insanity as disclosed thereby.

A diligent examination of the record fails to disclose that in the reception of any of this testimony, the court erred to the prejudice of the defendant, but on the contrary it appears therefrom with striking force that the

18

court in its desire to do justice leaned more to the protection of the defendant's rights than those of the state.

■ If the defendant was sane at the time of the perpetration of the offense charged, she was guilty of premeditated murder. If she was insane at the time of the homicide, she was not guilty of murder. Upon the question of her sanity, the testimony of the state and of the defendant is sharply conflicting. It was the province of the jury to determine under the evidence whether or not there was a reasonable doubt of defendant's sanity and whether or not she was sane or insane at the time of the commission of the crime charged. The jury discharged this duty and by its verdict found the defendant guilty of the crime charged. There being ample evidence to sustain the verdict of the jury, it cannot be urged that the verdict of the jury was wrong and that the evidence raised a reasonable doubt as to the defendant's sanity at the time of the commission of the offense. Under these circumstances, neither the lower court nor this tribunal can substitute its determination upon this point for that of the jury.

■ 2. It is claimed that the court erred in refusing an inspection of the letters written by deceased to defendant. This request was made before the trial and refused. During the trial defendant's counsel were permitted an inspection thereof and the court ruled that all of such letters as were shown to have been read by the defendant to any witness could be introduced in evidence. Thereupon eight of these letters were introduced in evidence and read to the jury. They were written by the deceased in California during the fall of 1917 and the spring of 1918. The writer therein professes his deep love for the defendant. The letters not introduced are of similar import and none bears date more recent than 1922.

The record discloses, from the lips of defendant herself in her conversations with the alienists, that she loved deceased and that he claimed to love her. The state did

not seek to show that deceased had no love for defendant. These letters all having been written and received in 1922 and prior thereto, it is inconceivable that they should have any probative value upon the question as to whether or not defendant was insane on November 28, 1928, when the homicide was committed. They were inadmissible, being entirely too remote. In any event, the court having permitted eight of these letters to be introduced and read to the jury and it having been shown that they were all of a similar character and the jury being advised of their general import, no prejudicial error can properly be assigned on account of the action of the trial court in this regard. Here again, the ruling of the court in permitting certain of these letters to be introduced was more in favor of the defendant than the state.

3. It is contended that the court erred in admitting in evidence the picture of the deceased taken immediately after the shooting because it was thereby sought to inflame the minds of the jurors. This exhibit shows the deceased lying on his right side on a hospital cot with a bullet wound in his head, his face covered with blood, and in a position which indicates that he had been asleep. The testimony discloses that the picture was taken immediately after the shooting and before the deceased had been touched or moved.

Any evidence, oral or visual, disclosing the facts and circumstances surrounding the commission of a crime is admissible. The fact that such evidence shows that the offense was particularly atrocious and might arouse the righteous indignation of the jurors does not render the same inadmissible.

4. Claim is made that the court's treatment of Mr. Mowry, of counsel for defendant, arising during the cross-examination of the state's witness, Dr. Ebaugh, was unduly harsh and prejudicial. After defendant's plea of insanity was made, the court ordered her incarcerated in the Psychopathic Hospital for observation and report by Dr. Ebaugh as to her sanity. Dr. Ebaugh had

testified that in his opinion defendant was sane at the time of the homicide and he had rendered a report so stating. During the course of his cross-examination it developed that Mr. Mowry had talked with him at the hospital prior to the trial. The following shows the questions and answers immediately preceding and the colloquy between court and counsel:

"Q. Didn't you ask me to consent to allow her to go before a commission? A. I remember talking to you informally about it and telling you that I felt this question of experts could be improved upon by having a commission appointed. I talked to you and many other individuals, and still talk to them, unsuccessfully.

"Q. Didn't I tell you at that time that if you felt as Dr. Pershing felt that I would consent to it if you could get the court's consent? A. I think you did, Mr. Mowry.
* * *

"Q. I told you at the time, when you suggested this commission, that providing you felt as Dr. Pershing felt and you and he were two members of the commission, that I would consent, didn't I?

"M. Wettengel: Just a minute. I object to that.

"The Court: It could not be possible that you were trying to influence this physician to whom I sent this lady for examination at that time, before he had made his examination?

"Mr. Mowry: Not a bit. I want to save an exception to the court's remarks. It was not possible.

"The Court: Why were you discussing this matter with him?

"Mr. Mowry: Because I was out to see him and the discussion came up.

"The Court: Who brought it up?

"Mr. Mowry: I think the doctor brought up the commission proposition, didn't you doctor?

"The Witness: I did, yes, sir.

"Mr. Mowry: That is the first I had heard of it.

"The Court: We will take this up further later."

The record fails to disclose that anything further was done in the matter and the court specifically instructed the jurors that:

"In determining the facts you should consider only the evidence given upon trial and the arguments of counsel based upon such evidence.

\* \* \*

"The arguments, statements and objections made by counsel to the court or to each other, and the rulings and orders made by the court, and the remarks made by the court during the trial and not directed to you, should not be considered by you in arriving at your verdict. The court did not by any words uttered during the trial, and the court does not by these instructions, give or intimate, or wish to be understood by you as giving or intimating, any opinion as to what has or has not been proven in this case, nor as to what are or are not the facts in the case."

Dr. Pershing testified for the defendant that in his opinion she was insane at the time of the commission of the offense charged. Mr. Mowry knew when he talked with Dr. Ebaugh that Dr. Pershing would so testify; he knew that if two of a commission of three subsequently appointed by the court were to testify that the defendant was insane, such a result would be extremely beneficial to the defendant. Dr. Ebaugh was an officer of the court directed to examine the defendant and to make a report of her mental condition. In view of this record, the remarks of the court to Mr. Mowry did not constitute prejudicial, reversible error. In any event, the instruction hereinabove quoted cured the error, assuming that one was made.

5. It is contended that the court erred in refusing to permit the following to be propounded to the jury on their voir dire, "Do you believe that the mental disease could exist over a long period of time without any physical manifestation?" The conduct and scope of the examination of a jury is in the discretion of the court.

22

Manifestly no layman could answer the question propounded. The objection to the question was properly sustained.

■ 6. Error is assigned because Judge McDonough and not Judge Sackmann, who presided during the trial of the case, received the verdict and that the same is a nullity. The argument on this ground is convincing only of the fact that defendant's counsel have been overzealous in their efforts to disclose something upon which error could be based. For years it has been the custom and practice in the district courts of Colorado, in the absence of the judge who tried a case, to call in another judge to receive the verdict and no good reason in opposition thereto has ever been presented. So to do is clearly within the powers of the court. It would be a travesty on justice to hold that, after a jury had been sworn; a trial held over a period of five days; the testimony of approximately 50 witnesses and arguments of counsel heard and the case submitted to the jury, a verdict accepted by other than the judge who tried the case would be a nullity necessitating the repetition of the entire trial.

■ 7. The assignment of errors consists of 70 grounds, all of which, not herein discussed, are wholly without merit.

We desire again to call the attention of counsel to the disapproval of prolixity of assignments of error as voiced by United States Circuit Judge Adams and that of Mr. Justice Miller quoted and endorsed by this court in the case of *Goodrich v. Union Oil Co.*, 85 Colo. 218, 274, Pac. 935, and again approved in a criminal case, that of *Wilder v. People*, 86 Colo. 35, 278 Pac. 594.

Defendant sought to take the law into her own hands thereby annihilating, not only the one she loved, a convalescent patient, but the inviolability and security of a hospital and the cardinal virtue of her vocation, the restoration of health. One who so acts and is found to be sane at the time must suffer the penalty the law imposes.

Judgment affirmed.

MR. JUSTICE BUTLER, not having heard the oral arguments on account of illness, does not participate.