## No. 16,438.

MARTINEZ v. THE PEOPLE.
(235 P. [2d] 810)

Decided August 27, 1951. Rehearing Denied September 17, 1951.

Mr. Isaac Mellman, for plaintiff in error.

Mr. Duke W. Dunbar, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. Norman H. Comstock, Assistant, for the people.

*En Banc.*

Mr. Justice Moore delivered the opinion of the court.

Plaintiff in error, to whom we hereinafter refer as defendant, has sued out a writ of error to have reviewed by this court a judgment and sentence of death pronounced against him on a verdict of first degree murder. It was charged in the information that on the 22nd day of March, 1949, the defendant "did unlawfully, feloniously, wilfully, deliberately and of his premeditated malice aforethought, kill and murder one Remiga Marie Ramirez." To this information the defendant entered the following pleas: 1. Not guilty. 2. "Not guilty * * * by reason of insanity at the time, since, and now."

With reference to the latter plea, counsel for defendant states: "Since there is no legal plea of not guilty by reason of insanity now, that must be disregarded." We agree that in legal effect the said plea of defendant was within the authorized statutory plea of, "not guilty by reason of insanity at the time of the alleged commission of the crime and since." '35 C.S.A., chapter 48, section 507. Amended S.L. '51, p. 325. Under this plea the trial court had discretion to try the sanity issue, and substantive offense, at the same time. *Wymer v. People,*

114 Colo. 43, 160 P. (2d) 987. The issues were thus tried without objection on behalf of the defendant.

The undisputed evidence clearly established that on the night of March 22, 1949, defendant was one of a party of four who visited a tavern at 1825 Larimer street in Denver, at which place the murder charged against defendant occurred. Others in the party were Bernie Trujillo, Remiga Marie Ramirez and Frieda Ramirez, who was the mother of Remiga. Circumstances leading up to the killing were, as follows:

Defendant met Remiga Ramirez for the first time on March 21, 1949, and discussed with her the possibility of marriage, or living together. She wanted to think it over, and on the evening of the 22nd, they met with the girl's mother, at which time the subject was discussed, and Remiga and defendant apparently concluded to assume the relationship of husband and wife, notwithstanding the fact that defendant had a wife and four children living in Walsenburg from whom he had been separated for some time. Remiga, her mother and defendant went out to get something to eat, and while at a restaurant, Bernie Trujillo joined them. They left this restaurant together and went to 1825 Larimer street, where a round or two of beer was ordered. While the party was seated at a booth, the defendant took offense at uncomplimentary remarks made by Trujillo concerning the character of Remiga's mother; he left the place, went a block and one-half to his room, secured a revolver and rejoined the party. Defendant testified that Trujillo again called Remiga's mother bad names, whereupon he tried to get the girl to come with him, to which Trujillo objected, saying that if she went with any other man he would kill her. Defendant further testified that he thought Trujillo moved as if to choke the girl, and so he shot him. The girl thereupon bent over the fallen Trujillo and the defendant's own story concerning the occurrence appears in his testimony as follows:

"So that when Trujillo laid down like that on the

booth when I shoot him, this girl—I don't know how, but he laid down like that (illustrating). And then the girl went down with him and lie down with him for a while, you know. And I was just standing at the bar. I didn't know what to think. I don't have nothing to think of, I didn't know where I was. By that time I was so mad I guess I was out of my mind. So then I just looked at the girl while I was standing up at the bar, I looked at them like that, and she got up. She says when she got up, she says, 'What you kill him for? Why did you kill him, you ——— ———.' I said, 'My mother's no bitch,' I said. So I got my pistol and shoot her, tried to shoot her. I was so mad. She laid down with Trujillo. I didn't like that. I got back in the bar and put my gun on the bar, and I didn't say nothing, never moved from there. The bartender was up there, the bartender up at the window, I don't know how far down. I didn't pay no attention to the rest of the people. I know all of them were up there. So pretty soon he came up, she looked at me, and that's when I draw my gun again and shoot again. And then she laid down again, and I came back and put my gun there. I was out of my mind by that time. And then she got up, straightened up like that (illustrating). So I took my gun and went clear across the bar and shoot like that (illustrating). I don't know, I think I shoot her, I don't know." Q. You don't know what? A. I think I shot right through her. I didn't know where I hit her that last shot."

Trujillo died in the ambulance on the way to the hospital. Remiga was dead when the officer arrived a few minutes following the shooting.

The day following the shooting, the defendant, who at all times referred to Remiga as "Emma," signed a confession in the presence of detectives in which he described the shooting as occurring in the following manner:

"When we got in there I buy the beers there for four of us, for Trujillo and me and Emma and her mother,

And then he — Trujillo he buys again. And then they start again — the girl's mother start to tell him — to tell Trujillo to go away — so Trujillo start again with the same bad words — saying bad words to Emma's mother and I didn't like it and that's when I lost my temper. I leave then and I went over to my room in the Moose Hotel and I pick up by gun and then I come back to the place where Emma and her mother was and Trujillo was and the old lady says to me to sit down in the corner of the booth. I sit down there and then Trujillo start pickin on Emma's mother again and Emma pick up a glass there and Trujillo goes to catch her like that (indicates with his right hand as though to grab someone) like he was going to grab for her here (indicates the throat) and I pick up my .38 like that (indicates by thrusting his left hand inside his suit coat pocket and then thrusts his left hand out in a gesture) and then I shoot him right away and then I went over there and threw that gun on the bar over there and I stand there to wait for the cops to come and then Emma start picking bad words on my mother and I say you can't talk that way about my mother and I picked up the gun again (indicates with a grab with his left hand) and I walked a few steps toward them and I shot at her and then I start to walk back to the bar again and I turn around and I see her head come up and I walk over and shoot her again and then I see her head go down like this (indicates by lowering his head in a downward motion) on top of Trujillo. And then I throw my gun on the bar again and I turn around and I see her raise up again and I walk over close and I shoot at her again and I walk over again and I throw my gun on the bar and then the police pick me up. Q. Why did you shoot Trujillo? A. I thought he was gonna catch her by the throat — catch Emma by the throat (indicates again by grabbing at his own throat). Q. Why did you shoot Emma? A. Because she cussed my mother bad words after I shot Trujillo. Q. Why did you shoot Emma the second time?

A. Because she came up with her head from Trujillo's body like that (indicates by placing his head on desk and then raising his head) and then I didn't know, I thought I didn't shoot her so I shoot her again — I shot her three times, because she raise up her head. Q. How many times did you shoot him — Trujillo? A. Once. Q. Do you know where you shot Trujillo? A. I don't know exactly but I tried to shoot him in the head — I think I hit him down here (pointing and indicating on himself on left side of neck) — I think I hit him on the left side. Q. Where did you shoot Emma — in what part of the body? A. I tried to shoot her right in the heart. Q. Did you intend to kill Trujillo when you shot him? A. Yes, that's what I did. Q. Did you intend to kill Emma too when you shot her? A. Yes, when she said that bad word about my mother."

Reversal of the judgment is sought on several grounds. It is contended that the trial court erred in admitting certain photographs in evidence; that error was committed in giving certain instructions and in refusing to give two instructions tendered by the defendant; that error was committed in submitting forms of verdict to the jury; that Dr. Charles A. Rymer was erroneously permitted to testify over defendant's objection; and that the trial court erred in giving an oral instruction after having read written instructions to the jury. We consider these contentions in the order stated.

First: *Did the trial court err in the admission of photographs?*

Exhibit C was a photograph of the body of Bernie Trujillo taken at the morgue several hours after the shooting. Notwithstanding the fact that his face is smeared over with dried blood, and his clothing disheveled and bloodstained, the picture identifies the dead man. Counsel for defendant objected to the admission of the exhibit upon the ground that "it is obvious that the picture is presented for prejudicial purposes," that "it has nothing to do with the killing," and that defendant was not on

trial for the "killing of Trujillo." The photograph, Exhibit G, was taken at the time defendant signed the confession and shows him as he affixed his signature to it in the presence of detectives. Exhibit K is a photograph showing the defendant and several policemen in the office of the captain of detectives. The defendant was shown with a paper in his hand and testimony in explanation of the exhibit was to the effect that the picture was taken while the detectives were reading the confession aloud to defendant prior to the time it was signed by him. Exhibits L and M are photographs taken of the deceased Remiga Marie Ramirez after removal of her body to the morgue, and show the bullet wounds which caused her death.

No error was committed by the trial court in the admission of these pictures. The death of Trujillo was inextricably connected with the acts causing the death of Remiga Ramirez, and defendant cannot rightly complain because the whole transaction was shown in evidence. The photographs of the dead man and woman only pictured the result of his own acts in the transaction which formed the basis of the murder charge which was being tried. We have heretofore held that photographs are admissible as evidence of anything which it is competent for a witness to describe in words, and that their admissibility does not depend upon whether the objects pictured could be described in words, but on whether it would be helpful to permit the witness to supplement his description by their use. *Potts v. People*, 114 Colo. 253, 158 P. (2d) 739. Neither are photographs inadmissible merely because they present vividly to the jurors the details of a shocking crime. *Moya v. People*, 88 Colo. 139, 293 Pac. 335. We said in *King v. People*, 87 Colo. 11, 285 Pac. 157: "Any evidence, oral or visual, disclosing the facts and circumstances surrounding the commission of a crime is admissible. The fact that such evidence shows that the offense was particularly atrocious and might

arouse the righteous indignation of the jurors does not render the same inadmissible."

The objections to the pictures of defendant taken at detective headquarters at the time of the reading and signing of the confession were, that the pictures would not "disclose anything that preceded the taking of the picture or anything in connection with the taking or. making of any statement," and generally that the pictures lacked probative value. These objections go only to the weight of the evidence and not to the question of its admissibility, and are without merit.

Second: *Did the trial court err in giving instructions and in refusing tendered instructions 1 and 2?*

■ Defendant's counsel objected to instructions 14 and 15 given by the court. The former is considered in answering the third question hereinafter stated, and will not be discussed at this point. Instruction number 15 covered the defense of insanity. Counsel finds no fault with that portion of the instruction which described and defined insanity. His objection was directed to the last sentence thereof, which is as follows: "But care should be taken not to confuse such mental disease with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, and kindred evil conditions, for where the act is induced by any of these causes the person is accountable to the law."

The precise questions here presented have been resolved against the contention of defendant's counsel by this court in *Battalino v. People,* 118 Colo. 587, 199 P. (2d) 897, and *Shank v. People,* 79 Colo. 576, 247 Pac. 559. These cases are decisive of the questions under discussion.

■ Defendant's counsel tendered an instruction to the effect that voluntary drunkenness is no excuse for a crime perpetrated under the influence, but intoxication if proved, might be considered in determining whether the defendant was capable of forming a willful, deliberate and premeditated design to take life. The tendered in-

struction was in the form approved by this court in *Brennan v. People*, 37 Colo. 256, 86 Pac. 79, in which case the evidence fully justified the giving of the instruction. In the case at bar, however, there is no evidence justifying the giving of the tendered instruction. While there was testimony that defendant drank a few beers between 5:30 p.m. and 10:15 p.m., the time the killings took place, not one witness of the many who saw him at the time of the shooting and immediately thereafter, stated that he was intoxicated or that he appeared to be in any degree under the influence of liquor. In his own testimony the defendant did not claim that he was intoxicated. In his confession he was asked the question, "Were you drunk at the time you shot Emma and Bernie Trujillo?" His answer was, "No, I wasn't drunk." In view of these circumstances there was no error in refusing to give the tendered instruction.

 Defendan's attorney tendered a second instruction dealing with the subject of pathological intoxication which concluded with the statement, "If you believe * * * the defendant was pathologically intoxicated on March 22, 1949, and by reason thereof could not distinguish between right and wrong, or was unable to choose the right and refrain from doing the wrong, you must find this defendant not guilty."

Pathological intoxication was defined by the tendered instruction as, "an acute mental disturbance due to large and sometimes small amounts of alcohol and manifesting over a short period of time excitement or furor with confusion and hallucinosis followed by amnesia." No authority is cited in support of the proposition that "pathological intoxication" is a defense which, if proven, will entitle the defendant, who relies upon it, to an absolute acquittal. No authority is cited in support of the definition of "pathological intoxication" which the tendered instruction contains. We pursue the matter no further, since we are certain that if any such defense is recognized in law, a point we do not decide, it certainly would

be entitled to consideration only in connection with the plea of not guilty by reason of insanity, and would not entitle defendant to the outright acquittal which the tendered instruction was designed to bring about. Moreover, there was no evidence whatever that this defendant had been intoxicated at any time within several months prior to the time of the crime charged against him in this cause. The court did not err in refusing to give the tendered instruction.

Third: *Did the trial court err in refusing to submit the forms of verdict requested by defendant relating to the issue of insanity?*

Counsel for defendant objected to instruction number 14 by which the jury was informed that "pleas entered by the defendant in this case are not guilty and not guilty by reason of insanity at the time of the alleged commission of the crime and since. Defendant's attorney contends that the instruction informed the jury that "defendant's plea of insanity was only one plea, namely, insanity at the time and since, whereas, in fact the plea should have been separated into two distinct pleas, namely, not guilty by reason of insanity at the time, and not guilty, by reason of insanity since the offense was committed. This point was renewed by objection to the form of verdict submitted on the question of insanity. Counsel for defendant submitted two separate forms of verdicts upon the question, one of which was "not guilty by reason of insanity at the time of the commission of the alleged offense," and the other, "not guilty by reason of insanity since the alleged commission of the crime." The court declined to submit these tendered forms of verdict to the jury and gave it the following form: "We the jury, find the defendant Otoneil Martinez, not guilty as charged in the information herein, by reason of insanity."

It is argued that under this form of verdict the jury could easily have understood that the insanity of defendant must have been established as of the time of the

offense, and that it was continuous thereafter, before such verdict could be returned by the jury, whereas in fact two separate pleas were entered by defendant upon which separate verdicts were mandatory.

██ ██ The record fails to disclose the entry by the defendant of a special plea of not guilty by reason of insanity since the alleged commission of the crime. If such a plea had been entered, or if the plea actually entered had been intended to so operate, the statute (section 509, chapter 48, '35 C.S.A. [amended S.L. 1951]) made a separate trial of such insanity issue mandatory, since it provides upon the entry of such a separate plea that, "The case shall be set down for trial on the issue of insanity alone, with no reference to the crime." Defendant participated in the trial. of all issues without asserting that his special plea of insanity required a separate trial, and he will not now be heard to contend that his plea was intended to raise an issue that required a separate trial.

The. plea disclosed by the record was one authorized by the statute under which no separate trial of the question of insanity was required. The statute, section 510, chapter 48, provides that where such a plea is entered "in addition to the other forms of verdict, the jury shall be given a form with the words 'not guilty by reason of insanity.'" The trial court followed strictly the statutory direction, and committed no error in its ruling as to the forms of verdict tendered by defendant's counsel.

Fourth: *Did the trial court err in admitting the testimony of Dr. Rymer?*

██ In the brief filed in this court on behalf of defendant, counsel asserts that the court erred in permitting Dr. Rymer, a psychiatrist, to testify; he also states in his brief, "At our request, although it does not appear in the record, we had Dr. Rymer appointed to examine the defendant. We were unable to use him for various reasons, none of which appear in the record, but among

others was the fact that we wished to rely on lay testimony as to the insanity of the defendant and did not wish to make it an issue between psychiatrists."

The doctor was called on rebuttal by the people. All that the record discloses concerning what happened, is the statement of the district attorney, as follows: "The people offer to call Dr. Rymer, who also examined the defendant prior to the trial." Thereupon the court said: "The court has ruled that this being rebuttal, all that he can testify to and that he will be limited to giving an opinion based upon the conduct that was testified to by the defense witnesses." We find no objection in the record based upon the ground that Dr. Rymer was in-, competent to testify without the consent of the defendant, because he was appointed to examine the defendant at the latter's request. Assuming, for the purpose of discussion, that such an objection had been made, and assuming further that the record disclosed the request of defendant for the appointment of Dr. Rymer, the objection to his testimony as a witness for the people, would be without merit. The only authority possessed by the court to appoint a psychiatrist upon application of the defendant is found in section 508, chapter 48, '35 C.S.A., (amended S.L. '51, p. 325) which provides in part, as follows: "The Judge may also appoint a commission of one or more physicians, specialists in mental diseases, to examine the defendant during said period, and the court may call and examine said physicians as witnesses at the trial. *Either the state or the defendant or both may call said physician or physicians as witnesses, * * *.*" (Emphasis supplied.)

Thus, it is clear that Dr. Rymer was not disqualified as a witness even upon the theory of defendant, which theory counsel admits is not disclosed by the record.

Dr. Rymer was asked the following hypothetical questions: "Q. Now, Doctor, there has been testimony here this afternoon that the defendant, Mr. Martinez, has been a rather heavy drinker, and that he is unpredictable in

drinking. There has been other testimony that in various conversations he changed the subject from one subject to another. There has been other testimony that on one occasion he was found barefooted in the middle of winter with his shoes off; other testimony that he is one of sixteen children; that he has a niece who was committed to the insane asylum; other testimony that on one occasion he came home, that his eyes were inflamed, that he asked for food, that he was furnished with some beans and he dished up three plates and stated that he had company when he was asked about it. From this testimony would you be of the opinion that the defendant is insane now or was on March 22, 1949?"

The substance of the objection was that the question did not contain a recitation of all material facts concerning which testimony had been given, and that insufficient reference was made to the evidence to provide adequate information upon which the doctor might express an opinion. The objection was overruled, and the doctor answered that from the facts recited in the questions he did not think "you could say that he is insane." Upon cross-examination the following took place: "Q. Doctor, in order to answer the question that was propounded to you and give a full and proper answer, you would have to have more facts, would you not? A. Yes, sir.

"Mr. Mellman: I ask that the answer that the doctor gave be stricken, the answer to Mr. Doyle's question, that he could not say he was insane at the time.

"Mr. Doyle: I don't see why, Your Honor.

"Mr. Mellman: He said he would have to have more facts to give a full and complete answer.

"The Court: That does not preclude his other answer, it enlarges upon it. Objection overruled."

The objection made by counsel to the hypothetical question did not point out the material facts which it was contended were omitted therefrom. Nothing on cross-examination of the witnesses was sought as an enlarge-

ment upon the opinion of the doctor. After the cross-examination, his answer to the hypothetical question was rendered meaningless, and defendant could not possibly have been prejudiced thereby. Our examination of the bill of exceptions warrants the assertion that the hypothetical question included a reference to all of the conduct of defendant shown in the evidence upon which reliance was plead for a finding that he was insane.

In *People v. Denman,* 179 Cal. 497, 177 Pac. 461, a comparable situation was presented. The supreme court of California said: "Counsel for defendant had the right on cross-examination to question these expert witnesses fully as to the effect of such additional facts as he deemed shown by evidence and material to the issue, and the record shows that he was fully accorded this right. There is no basis whatever for any claim of prejudicial error in the matter of rulings on hypothetical questions.

*State v. Crowe,* 39 Montana 174, 102 Pac. 579, is to like effect, from which we quote: "In the examination of expert witnesses counsel may embrace in his hypothetical question such facts as he may deem established by the evidence; and, if opposing counsel does not think all the facts established are included in such question, he may include them in questions propounded on cross-examination. Any other course would result in endless wrangles over the question as to what facts were, and what facts were not established."

The fairness of a hypothetical question is largely a matter resting in the discretion of the trial court, and a ruling thereon will not be ground for reversal in the absence of a showing of an abuse thereof. Wigmore on Evidence (3d ed.), section 682; *United States v. Aspinwall,* 96 F. (2d) 867. No such abuse of discretion is shown in this case.

Fifth: *Did the trial court err in giving an oral instruction to the jury?*

After the reading of the written instructions,

prior to argument, and following a conference between the court and counsel, the court said, addressing the jury: "There is one matter which counsel has just called to the attention of the court, that the court will instruct you orally on, and that is that this defendant is on trial only for the charge in the information, that is, the death of Remiga Marie Ramirez, and that therefore any evidence as to what happened to Juan Trujillo was admitted at the trial only to show the transaction or what took place and only in that regard, and it is not to influence you any further than to show all the circumstances surrounding the transaction."

No objection was made by counsel for defendant to these remarks by the court, and no mention of the matter was made in the motion for new trial. It is assigned as error for the first time in this court. It is agreed that section 491, chapter 48, '35 C.S.A., requires that all instructions shall be given in writing. This court, in *Irving v. People,* 43 Colo. 260, 95 Pac. 940, in which the exact point was raised, said: "If the statement could be considered as an instruction as to the law, it being in favor of the plaintiff in error, giving it orally was at most an error without prejudice, and one that does not constitute a ground for reversal." This statement is fully applicable to the case at bar.

We have carefully considered every argument advanced for reversal, and have not let technical rules of procedure prevent a determination of each point upon its merits. We find no error.

The judgment is affirmed, and it is ordered that it be executed during the week commencing October 15, 1951.