No. 19,320.

DAVID ALEXANDER PENNEY, ET AL. *v.* THE PEOPLE
OF THE STATE OF COLORADO.
(360 P. [2d] 671)

Decided March 27, 1961.

Mr. FRANK E. EVANS, for plaintiff in error David Alexander Penney.

Mr. RICHARD D. ROBB, for plaintiff in error James Robert Marshall.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. J. F. Brauer, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

DAVID ALEXANDER PENNEY, nineteen years old, and James Robert Marshall, twenty years old at the time of their joint trial on October 29, 1959, in the district court of Pueblo County, were convicted of murder in the first degree by a jury which fixed punishment for Penney at life imprisonment and for Marshall at death. To review the judgments entered upon the jury verdicts, after motions for new trial were argued and denied, defendants are here jointly on writ of error.

Penney was convicted as an accessory before the fact to the homicide actually perpetrated by Marshall. The attorney general representing the People, with the candor required of him when the situation warrants, has admitted the conviction of Penney was erroneous and has admitted that at the conclusion of the evidence presented by the People the court should have directed a

verdict of not guilty in favor of Penney. At most, the evidence would support only a charge of accessory during and after the fact, a misdemeanor, not a felony. The evidence offered to support the charge of murder was circumstantial and entirely consistent with the innocence of Penney, all of which the attorney general admits. Accordingly, the judgment of conviction against Penney is reversed and the cause remanded with directions to vacate the judgment and sentence and to discharge the defendant Penney.

Marshall admitted the homicide and gave a voluntary detailed confession. His only defense was that he was "Not guilty by reason of insanity at the time of the perpetration of the offense and since." Our examination of the propriety of the conviction of Marshall and our resulting determination of his principal assignment of error make it unnecessary to recite the evidence of the crime or to decide the other questions raised by the argument.

The one assignment which we consider and determine as entitling the defendant to a new trial is the first one asserted by him, as follows: "1. That the defendant James Robert Marshall did not receive a fair and impartial trial as the Judge early in the proceedings formed an opinion about his insanity plea and in all rulings and actions thereafter the Judge demonstrated a bias and prejudice against the defendant Marshall and his plea, resulting in the denial of due process of law."

The trial judge, in a number of unusual preliminary proceedings, all of which were initiated on the judge's own motion, indicated that he was personally concerned that Marshall's insanity plea might be successful and that he had personally determined him to be sane.

The first of these ex parte hearings was conducted after the court received a letter from the Colorado State Hospital over the signature of J. L. Rosenbloom, M.D., Assistant Superintendent, advising the court "that the

defendant Marshall is now legally insane and was legally insane at the time of the alleged commission of the crime." The letter further advised the court that Dr. B. G. Carson, Staff Psychiatrist at the Colorado State Hospital, would be able to testify with respect to the sanity of defendant Marshall. Upon receipt of this letter, the court conducted a *private examination* of the psychiatrists, the exact nature of which is unknown because no record was made of the proceedings and neither the district attorney, defense counsel nor the defendant was present. But as an aftermath of the conference with the psychiatrists the court ordered the parties — the defendant and his council and the district attorney — to appear August 28, 1959.

This particular hearing, in itself, was unusual. The court on its own motion set the hearing. It had not been requested on motion of either party, and the nature of the hearing was unknown to counsel when they appeared at the court's behest. Thereupon the court announced that he had called the hearing for the sole purpose of obtaining the consent of defendant's counsel for further medical investigation since he (the judge) was not satisfied with the report from the staff of the Colorado State Hospital. The order setting this hearing and the fact it was held does not appear in the minutes of the court or the court record, but the reporter's transcript reveals that the reason for the proceeding was announced by the court as follows:

"The court, as a matter of record, always requires the Colorado State Hospital, or the commission, to furnish the court a copy of their mental and physical examination. The court read the examination and the conclusion. The court also permitted counsel for Mr. Marshall, Mr. Robb, to read this report and I permitted the District Attorney to read this report for the reason that the *court could not reconcile in its own mind the conclusion, or findings by the commission that the defendant was insane in view of the examinations that were conducted.*

*"Now, I have talked to Dr. Rosenbloom and I have talked to Dr. Carson, and they have attempted to explain this matter to me.* I presume that counsel have talked with them, likewise. So the matter rests there. Now, the court — I mean if you are satisfied that this is the finding of the commission and willing to go to trial on this matter on this question of insanity, the court will permit it, but if either of you feel that this possibly is not the — rather, this matter desires further investigation, the court will also permit you to pursue that matter. I want this defendant to be fully protected and I want him to be accorded every benefit that the letter gives him. That is the only comment that I have to make." (Emphasis supplied.)

Neither counsel for the defendant nor the district attorney, at this invitation of the court, asked for the appointment of any other psychiatrist. In fact, the district attorney said, "I have nothing to say, Your Honor. If the defendant's counsel feel that they want to go to trial, we have no objection. In fact we would be happy if the court is in position to set it down for trial right now." Whereupon the court determined that the issue of insanity should be tried separately and should be tried first and issued the following orders:

"The Court: I feel — in view of the finding of the commission here, I think there should be only one — but I think there should be a trial on this issue of insanity first. * * * I believe it is the prerogative of the Court to set the trial on the issue of insanity, only. Of course — assuming the Court finds him to be sane, you can bring in evidence at the second trial as to capacity to form a specific intent, I am aware of that fact, Mr. Robb, but I do think that in view of the finding of this commission, that the matter of insanity should be tried first."

The above proceedings appeared to settle the matter, but on September 14, when the parties appeared to obtain a trial date for Marshall alone on the issue of his

insanity, the court, without any request from either party and without any apparent reason, announced:

"The Court has previously discussed setting aside some time for the trial of this case. Due to the nature of the case, and possibly due to the fact that the case will be of considerable duration, the Court has decided that the cases will be tried at one time; that is, the issue of sanity to be tried with the case in chief."

This abrupt change of attitude by the court was strenuously objected to by counsel for Marshall who pointed out that when the court refused the two defendants separate trials, then the issue of insanity, affecting only Marshall and not involving Penney, would entitle Marshall to a separate trial, at least on that one issue. The court overruled the objection and set the trial date as of October 6, 1959.

With the trial date set, there was nothing more before the court. However, ten days after the trial setting, on September 24, 1959, in an ex parte proceeding, the court entered an order appointing another psychiatrist. This surprise motion, a little more than twelve days before the date set for trial, was a distinct departure from the position previously taken by the district attorney, who almost two months previously had told the court he had no desire to have additional psychiatrists appointed and was to go to trial on the issue of insanity. What motivated the district attorney at the late date is unknown, but his petition indicates he made the request to satisfy the court, for he stated in his petition as follows:

"That the *Court has indicated* that the People of the State of Colorado *could employ the services of a Psychiatrist* for the purpose of a further examination of the defendant, James Robert Marshall.

"WHEREFORE, Petitioner prays that an order issue from this Court granting the People of the State of Colorado the right to secure the services of a Psychiatrist for the purpose of examining the defendant, James Robert

Marshall and the costs incurred be paid by the County."
(Emphasis supplied.)

The impropriety of this action was challenged and motion filed by defense counsel to vacate the order, which was denied. In *Smith v. People,* 8 Colo. 457, 8 Pac. 920, we find this appropriate comment:

" * * * It is a general rule of law that the prisoner, in cases of felony, must be present at every step in the proceedings, or the proceedings will be invalid. So important is this right that, except in cases of misdemeanor, it cannot be waived by counsel. * * * "

■ A reading of the record of the trial reveals many instances of abrupt and inconsistent rulings of the court. It is conceded that the judge is given discretion in the conduct of the trial and has discretion to rule on the scope, extent and conduct of cross examination. *Martinez v. People,* 124 Colo. 170, 235 P. (2d) 810. But in this trial defense counsel encountered from day to day rulings by the court completely contrary to previous pronouncements on similar questions. The court, in effect, adopted a double standard, depending upon "which side was up to bat." For example, the district attorney was allowed to propound a series of hypothetical questions with comparative ease and was given wide latitude, permitting him to include in his hypothesis matters totally unrelated to the facts at the trial, and hypothetical instances which ranged from the imaginative to the fantastic. We do not propose here to go into whether the hypothetical questions were proper, but we do comment upon the dilemma in which defense counsel was placed with the following incidents, among many.

Dr. Carson, state psychiatrist, who had testified on direct examination that in his opinion the defendant acted under an irrepressible impulse, was asked the question: "Doctor, supposing that this incident — strike that. [sic] Prior to the time that the defendant Marshall did what he did, and a half a dozen citizens were stand-

ing around the car, under those circumstances, do you feel he would have done this act?" Defense counsel objected on the ground that the facts of the case showed that the incident occurred late at night, in a lonely, dark and secluded spot where only the two defendants and the decedent were present, and that, therefore, the hypothetical question presupposed a situation entirely unrelated to the case being tried. This objection was overruled. The doctor was asked to imagine the situation as occurring on Main Street in Pueblo or to suppose a police officer was at hand pointing a loaded revolver at the head of the defendant Marshall. Repeated objections were made by counsel to this line of questioning. The court overruled the objections with the brief statement, "I am going to overrule the objection. It is a hypothetical question." Upon the further argument by counsel with the statement, "But *it is not based on facts and the evidence before this court.*" the court retorted, "I think I will permit the question." However, when defense counsel asked a hypothetical question of one of the psychiatrists, and after the district attorney objected, the court sustained the objection with the following lengthy ruling:

"I think your hypothetical question, Mr. Robb, involves facts which have not come before the jury, and you are missing facts which have, and some which have not come before the jury. I think if you state your hypothetical question on the basis of facts which are properly before the jury, then I expect that you might be all right on your question, but at this time, I am going to sustain the objection."

After several attempts by counsel to reframe the hypothetical question to overcome the objections of the district attorney, the court again announced his ruling to be:

"If you want to ask a hypothetical question, that is proper, but I think it should be predicated on what the

*facts are* and *not what the proposition might be,* if certain facts exist." (Emphasis supplied.)

██ As stated above, we recognize that the court has considerable discretion as to the scope and extent of cross examination, but we do not view that discretion as permitting rulings limiting one side to *only the facts* elicited at the trial, and allowing the other side to go completely outside the record and propound questions based upon highly speculative and imaginative fact situations.

In another instance the court permitted the district attorney to propound to the psychiatrist, Dr. Conde, the following question:

"Now, in your experience, have you ever *heard* of delinquent men who preyed upon known homosexuals for the purpose of robbing them, rolling them, or preying upon them?"

To which the witness was permitted to give the following answer:

"I may answer it this way. As you know, from my history, I spent five and a half years in the Medical Army Corps, and as psychiatrist, worked with known homosexuals, as the Government, for National Security purposes are very much interested in homosexuals, and because these people are so known, they are blackmailed and abused, and the fear is ever present because of their activities, they will be forced to this sort of thing, and therefore, might jeopardize our National Security. This is the way the army finds out about this. From the standpoint of the psychiatrist, of course, we know that there are two general classifications of homosexuals, one the aggressive, sadistic type, and the other the peaceful masochistic type. Certainly this masochistic type of person is very likely to get himself kicked around, because of the kind of a person he is. The answer to that question is yes, certainly, this is well known."

The question was not a hypothetical one and did not call for the expression of the expert's opinion and had

nothing to do with the issue of sanity or insanity, for which the expert had been called in rebuttal.

The foregoing excerpt of proceedings from the arraignment to the conviction and sentence to death of this young offender does not mean that other examples could not be cited. Considered one by one and viewing the incidents as occurring before the jury was empaneled and without its knowledge, each may seem of no great moment. But viewed as a whole and observing the actions of the trial court in the aggregate, causes us to pause and ponder. Can it be said that the two psychiatrists, subjected as they were to a private cross examination by the court, were not intimidated and did not in some fashion shade or modify their testimony in order not to offend the judge? Both were state employees, in a state hospital in Pueblo, who would be called in other trials and would encounter the judge under a variety of circumstances.

The court at the outset was of the opinion that the observations and conclusions of the two psychiatrists were not worthy of belief and that he personally did not believe their convictions to hold much weight. In order for the jury to arrive at its verdict of guilty, its verdict that defendant Marshall was sane, and, in addition, prescribe the death penalty, means that it had to totally disregard the testimony of the two expert psychiatrists. Was the rejection by both the court and the jury of this evidence a mere coincidence? Does the action of the jury vindicate the opinion of the Court?

The actions of the trial court may, on the cold printed word, indicate bias in more or less abstract form, but considering the same actions as a series and together, they take on the aspect of bias and prejudice which justifies the conviction that the defendant was tried unfairly. We cannot escape the conclusion that the contagion of the judicial bias which infected the entire proceedings, was transmitted to the jury. The strong possibility or probability that such matters in substan-

tial measure influenced the jury should stay our hand from affirming a conviction and sentence involving the penalty of death.

The judgment and sentence of the trial court is reversed and the cause remanded to the district court of Pueblo County for a new trial as to Marshall, before a different judge, to be agreed upon by the district attorney and counsel for the defendants. If the parties cannot agree, the court shall certify the matter to the Supreme Court for the appointment of a trial judge.

■ One other matter has been made a part of the record here, totally unrelated to the trial, but which counsel for the defendant has included in the record. We refer to the petition of court-appointed counsel for Marshall requesting the court to award him attorney fees. It appears that to date the court has made no ruling on counsel's petition and no allowance for fees have been made, although several hearing dates were set and vacated by the court. The statute in relation to compensation of attorneys appointed by the court to represent indigent defendants is as follows:

"Whenever an attorney, appointed by any court to defend prisoners, shall have tried the case or shall have quashed any indictment therein, the clerk of said court *shall* give him a certified copy of the order of the court so assigning him as counsel, and the judge of said court *shall* indorse upon such order the sum to be allowed as a fee in the case, and upon the presentation of such order, with such indorsement, the county commissioners of the county shall order a warrant to be drawn on the county treasury in payment of such fee." (Emphasis supplied.) C.R.S. '53, 39-7-30.

This matter is also to be presented to and ruled upon by the judge before whom the new trial is conducted.

Mr. Justice Moore and Mr. Justice Doyle dissent.

Mr. Justice McWilliams not participating.

Mr. Justice Doyle dissenting:

I respectfully disagree with both the conclusion and the reasoning of the majority opinion in this case as to the defendant Marshall. I concur in the disposition of the Penney case. I shall briefly outline the basis of my disagreement.

The fundamental weakness of the majority opinion is found in its inability to demonstrate that the prejudice of the trial judge, if it existed, had anything whatsoever to do with the verdict of guilty and of sanity at the time of the commission of the offense. The state of mind of the trial judge was not and is not now in issue and we can concede for the present purpose that the trial judge indicated that he was not unaffected by the atrocious crime the record discloses, the circumstances of which I deem it unnecessary to detail since my reasoning does not relate thereto.

The first inquiry is whether the trial court displayed bias in connection with the appointment of additional psychiatrists which requires us to hold that the accused was deprived of a fair and impartial trial. Some analysis of the facts leading up to the trial court's decision to appoint a third psychiatrist is here important.

The staff psychiatrists of the Colorado State Hospital reached the same conclusion that the accused was insane. However, these two physicians gave different reasons in support of this conclusion. One of them reported that Marshall was unable to distinguish between right and wrong, whereas, the other concluded that he could make such a distinction but was unable to refrain from doing the wrong. This was the background for the court's action in first questioning these psychiatrists privately, in calling the parties together and finally in commissioning a third psychiatrist to make an examination. The judge's motives are apparent from his remarks:

"* * * The court could not reconcile in its own mind the conclusion, or finding by the commission, that the

defendant was insane in view of the examinations that were conducted."

Under these circumstances, the court might very well have been confused rather than biased and could very logically have been seeking further enlightenment on the questions before it. It is true that the district attorney at first evidenced no particular enthusiasm for a further investigation, but in view of the nature of the proceedings and the interest which the court was advancing, I fail to see any invalidity in this conduct.

The pertinent statute, C.R.S. '53, 39-8-2, not only authorizes the court to perform certain administrative tasks, it *requires* it to perform them. In addition to committing one who has pleaded insanity to the state hospital, "* * * The judge may also appoint a commission of one or more physicians, specialists in mental diseases, to examine the defendant during such period. Any physicians so appointed by the court may be called by either party to the action or by the court itself, and when so called shall be subject to all legal objections as to competency and bias and as to qualifications as an expert."

Other sections of this chapter make it very clear that the trial judge is expected to interest himself in the subject of criminal insanity, both before trial, during trial and after conviction. Thus the policy implicit in the statutes themselves throw an entirely different light on the conduct of the trial judge. He was not intermeddling in something which was not his concern. Rather he was engaged in the discharge of his statutory duties. Are we now to hold that a judge dare not display interest in these proceedings and that the penalty for seeking the truth on this subject of criminal insanity is reprimand and ouster from the case?

Quite apart from the special statutory character of the proceedings here under consideration, my philosophy is that the judge at the trial is not a mere referee who remains aloof and allows opposing counsel to formulate

trial policies. He also has an interest in achieving justice. This idea was lucidly expressed by Mr. Justice Frankfurter in a special dissenting opinion in the case of *Johnson v. U.S.*, 333 U.S. 46, 53, 54, a proceeding in which the Court also had administrative obligations, wherein it was said:

"While a court room is not a laboratory for the scientific pursuit of truth, a trial judge is surely not confined to an account, obviously fragmentary, of the circumstances of a happening, here the meagre testimony of Johnson, when he has at his command the means of exploring them fully, or at least more fully before passing legal judgment. A trial is not a game of blind man's buff; and the trial judge — particularly in a case where he himself is the trier of the facts upon which he is to pronounce the law — need not blindfold himself by failing to call an available vital witness simply because the parties, for reasons of trial tactics, choose to withhold his testimony.

"Federal judges are not referees at prize-fights but functionaries of justice. See *Herron v. Southern Pacific Co.*, 283 U.S. 91, 95; *Quercia v. United States*, 289 U.S. 466, 469. As such they have a duty of initiative to see that the issues are determined within the scope of the pleadings, not left to counsel's chosen argument. See *New York Central R. Co. v. Johnson*, 279 U.S. 310, 318. Just as a Federal judge may bring to his aid an auditor, without consent of the parties, to examine books and papers, hear testimony, clarify the issues, and submit a report, in order to 'render possible an intelligent consideration of the case by court and jury,' *Ex parte Peterson*, 253 U.S. 300, 306, and in so doing has the power to tax the expense as costs 'necessary to the true understanding of the cause on both sides,' *Whipple v. Cumberland Cotton Co.*, 3 Story, 84, 86, he has the power to call and examine witnesses to elicit the truth. See *Glasser v. United States*, 315 U.S. 60, 82. He surely has the duty to

do so before resorting to guesswork in establishing liability for fault."

The comments of the trial judge which are quoted in the majority opinion do not show in and of themselves prejudice on his part. These appear to be reserved, detached, fair statements of one interested in the ultimate triumph of justice and not statements of one bent on conviction of the accused. The fact that the judge conducted private interrogation of the psychiatrists after he received their reports does not point to prejudice. This is explainable in the fact that the opinions of the two psychiatrists were in conflict and had to be reconciled. Moreover, this interrogation did not have the effect of changing the opinions of these doctors. They continued steadfast in their opinions that the accused was insane, testifying to this at the trial. The appointment by the court of a third psychiatrist did not result in prejudice because the accused did not submit to examination. This third physician obtained the information forming the basis for his opinion from observations which he made during the trial. He testified on hypothetical questions only. Had the accused been subjected to a compulsory examination or if it could be shown that his rights suffered in any way the present approach would have merit.

In view of the conflict between the two state psychiatrists and in the light of the duties imposed on the court by statute and considering the inherent obligations of the trial judge, and in view of the lack of showing of any demonstrable prejudice, I disagree with the conclusion of the majority that the trial judge exceeded his powers or conducted himself in any manner invalid or prejudicial to the accused.

The second inquiry is whether the scope of cross examination and the rulings of the court with respect thereto operated to prejudice the defendant.

The majority discusses at length the broad scope of cross examination of Dr. Carson allowed by the court

as against the relative ease with which the district attorney was able to conduct his questioning. The rulings of the court are set forth in full. Obviously these rulings do not constitute prejudicial error. If so, the majority would certainly specify the error and reverse the case. The rulings are intended to show a prejudicial atmosphere of the case and in my opinion they fall short of the mark. For example, Dr. Carson was asked whether he felt that Marshall would have acted differently had a half dozen citizens been standing around the car at the time. The purpose of this question was to test Dr. Carson's opinion that Marshall had acted under an irresistible impulse. A question put to Dr. Conde was whether he had ever known or heard of reports where delinquent men preyed upon known homosexuals for the purpose of robbery or stealing. While this question might conceivably have been asked as bearing upon the issue of guilt, it had no relationship to the sanity of the accused. Nevertheless, the case ought not to be reversed on this ground in view of the fundamental and salutary doctrine that the trial court has a discretion as to scope and extent of cross examination. See *Martinez v. People,* 124 Colo. 170, 235 P. (2d) 810; Melville, *Manual of Criminal Evidence.* The other question, namely, that the hypothetical question did not contain sufficient facts, was also a matter within the discretion of the trial court and should not be disturbed. *Martinez v. People,* supra.

There is good reason for the rule that the trial judge has a broad discretion in dealing with questions of evidence and especially with hypothetical questions. For an appellate court to try to govern this kind of thing with rigid rules is highly impractical. Furthermore, that which appears erroneous when spotlighted assumes a different complexion when presented in full context. This makes the job of rigid supervision an impossible one.

Needless to say, from the above discussion I disagree

with the conclusion of the majority that the defendant was denied a fair trial resulting from an attitude of bias on the part of the trial judge because there is not sufficient showing of bias from which the defendant can demonstrate that the trial was tainted. We should not condemn the work of the trial judge merely because counsel argues unfairness. Undoubtedly to defense counsel the trial appeared unfair. Even assuming that the trial court was subjectively prejudiced, the cases are uniform in holding that the court's state of mind does not furnish a basis for a reversal. We cannot demand pure unadulterated minds in trial judges. The question is whether or not the judge's state of mind was translated into conduct prejudicial to the defendant. See *Bashford v. People,* 110 Colo. 479, 135 P. (2d) 516; *Rogers v. People,* 104 Colo. 594, 94 P. (2d) 453; *King v. People,* 87 Colo. 11, 285 Pac. 157; *Imboden v. People,* 40 Colo. 142, 98 Pac. 608. See also *Baker v. People,* 72 Colo. 68, 209 Pac. 791; *Jones v. People,* 6 Colo. 452.

Being of the opinion that the defendant has not succeeded in showing that he was prejudiced but on the contrary that the indications point to adequate protection of his rights, I would affirm the judgment.

MR. JUSTICE MOORE joins in this dissent.